TWENTIETH CENTURY-FOX FILM CORPORATION, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 89631.    Filed November 4, 1965.

*William W. Owens* and *Robert E. Frisch*, for the petitioner.
*William F. Chapman*, for the respondent.

HOYT, *Judge:* Respondent determined a deficiency of $67,500 in the income tax of Charles K. Feldman Group Productions (hereinafter referred to as Group Productions or the corporation) for the taxable period January 1 to September 8, 1955. Liability is asserted against the petitioner herein, Twentieth Century-Fox Film Corp., as transferee of Group Productions' assets. Petitioner does not dispute its transferee liability if Group Productions is held liable for the deficiency.

The only issue remaining for decision is whether the gain from the sale by Group Productions to its controlling shareholder of all its rights in the motion picture "A Streetcar Named Desire" is to be treated as ordinary income or capital gain.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is a Delaware corporation organized in 1952 with its principal place of business in New York City. Petitioner is the transferee of the assets of Charles K. Feldman Group Productions.

Charles K. Feldman Group Productions was a California corporation organized in 1937. It filed its Federal income tax return for the taxable period January 1 to September 8, 1955, with the district director of internal revenue in Los Angeles, Calif. At all times in 1955 prior to September 8, 1955, Charles K. Feldman (hereinafter referred to as Feldman) was the record holder of 100 percent of the preferred and 96.25 percent of the common stock of Group Productions. Feldman's "occupation" in 1955 was serving as president of Group Productions and also as president of a talent agency.

In and prior to 1955 the business activities of Group Productions had consisted of the production of motion pictures and the exploitation of motion-picture rights in literary properties. Group Productions would acquire exclusive exploitation rights to literary properties such as books and plays. Sometimes Group Productions would license or sell a literary property to a production company. Sometimes it would prepare a screenplay or motion-picture script and then license or sell the literary property with the prepared script. On only four occasions did Group Productions itself produce a motion picture from one of its literary properties. After completion of production these films were distributed (through an independent distributing organization) and film rental income was received therefrom.

In 1949 Group Productions acquired the exclusive motion-picture rights to Tennessee Williams' play, "A Streetcar Named Desire." Group Productions thereafter caused four screen adaptations of the play to be prepared and it produced a motion picture (hereinafter referred to as "Streetcar") from the last of said adaptations. Production of the picture was financed in part by Warner Bros. Pictures, Inc., and distribution rights were acquired by Warner Bros. Under the terms of this agreement Group Productions owned the photoplay, the copyright therein, and the films.

The first general release date of "Streetcar" was September 29, 1951, and Group Productions' investment therein was $1,734,421.86. By the end of 1952 Group Productions' investment had been completely amortized and taken as deductions in its Federal income tax returns against its income from "Streetcar," and thereafter Group Productions had a tax basis of zero in that property.

Disputes arose between Group Productions and Warner Bros. as to the latter's accounting for the receipts from "Streetcar." By agreement dated March 8, 1955, the parties settled their disputes. As part of this agreement Group Productions agreed that thereafter and until January 1, 1958, Warner Bros. might distribute and license others to exhibit the photoplay and retain all proceeds therefrom without rendering an accounting to Group Productions. However, this agreement specified that Warner could not generally reissue "Streetcar"

in any country or territory and after 45 days from the date of the contract Warner was prohibited from distributing or licensing the exhibition of "Streetcar" "in such cities in the United States or Canada where said photoplay has heretofore been exhibited." Warner Bros. agreed that on January 1, 1958, all of its remaining distribution rights and all its other rights in and to "Streetcar" and the income therefrom should terminate.

By letter dated March 7, 1955, petitioner, Twentieth Century-Fox, made alternative offers to purchase all of the assets of Group Productions subject to its balance sheet liabilities or all of the issued and outstanding stock in Group Productions. Petitioner's offers called for the payment of $1,650,000 as consideration for the purchase of either of these properties. Said alternative offer was to remain open until 15 days after a ruling had been secured from the Commissioner of Internal Revenue determining the tax consequences of the sale of Feldman's stock or the sale of Group Productions' assets pursuant to said offer, or May 15, 1955, whichever was the earlier date. In the offer for assets petitioner allocated $250,000 of the offer to "Streetcar."

By letter dated March 8, 1955, Feldman applied to the Commissioner of Internal Revenue for rulings—

a. That the sale of all its assets by Group Productions to petitioner pursuant to petitioner's offer of March 7, 1955, would, if made subsequent to the adoption of a plan of complete liquidation of Group Productions and within a 12-month period beginning with the date of adoption of such plan, result in no gain or loss to Group Productions by reason of such sale, pursuant to section 337 of the Internal Revenue Code of 1954,[1] and that the proceeds of said sale would be treated in the hands of Feldman as gain from the sale or exchange of capital assets held for a period of more than 6 months; and

b. That the proceeds of the sale by Feldman of his stock in Group Productions to petitioner pursuant to petitioner's offer of March 7, 1955, would be treated as gain from the sale of capital assets held for a period of more than 6 months.

Thereafter conferences were held in Washington, D.C., between representatives of the Internal Revenue Service, two of petitioner's attorneys, and the accountant for Feldman and Group Productions. One subject of these conferences was the possibility that Group Productions might be treated as a collapsible corporation under section 341. Ultimately the conferee for the Internal Revenue Service indicated that a favorable ruling on the sale of the shares would be issued if prior to the sale "Streetcar" were purchased from Group Productions for cash. This was reported to Feldman and Feldman expressed a

---

[1] All statutory references herein are to the Internal Revenue Code of 1954.

willingness to purchase "Streetcar" from Group Productions for $250,000.

On June 10, 1955, Feldman wrote a letter to petitioner proposing that petitioner's offer to purchase the assets of Group Productions be withdrawn and its offer to purchase the outstanding shares of Group Productions be amended so as to make it conditional upon Feldman's first purchasing "Streetcar" from Group for $250,000 cash. Petitioner amended its offer accordingly.

Feldman in 1955 at the time of negotiations with petitioner intended and desired to dispose of all of his properties in Group Productions.

By letter dated August 12, 1955, the Acting Chief, Corporation Tax Branch, Tax Ruling Division, Internal Revenue Service, advised Feldman that if, prior to the sale of shares in Group Productions to petitioner, he purchased "Streetcar" from Group Productions for $250,000, the sale of his shares to petitioner would meet the requirements of the so-called 70-percent rule set forth in section 341(d)(2) (which removes the collapsible corporation taint), and a gain on such sale would be taxable as long-term capital gain.

On September 1, 1955, Feldman purchased from Group Productions all of its right, title, and interest in and to "Streetcar" for $250,000 cash. Prior to this sale of "Streetcar" to Feldman, Group Productions had produced motion pictures and exploited motion-picture rights in literary properties. It did not generally derive its income from the sale of pictures or its interests therein. Group Productions' income from motion pictures had been derived from its share of rentals of such pictures through distributing organizations. Its income from exploitation of motion-picture rights in literary properties was derived either by the production of a picture which then yielded income as mentioned or by the licensing of another producer to use the property to produce a picture.

On September 8, 1955, petitioner purchased all the outstanding capital stock of Group Productions, including the shares owned by Feldman for $1,650,000.

On June 19, 1957, Group Productions adopted a plan of complete liquidation and, pursuant to said plan, was fully liquidated by August 31, 1957. At all times subsequent to the adoption of a plan of liquidation until completion thereof, petitioner was the sole stockholder in Group Productions. Pursuant to the plan of liquidation all of Group Productions' assets were transferred to petitioner. The fair value of the assets received by petitioner upon the liquidation of Group Productions was greater than the liabilities of Group Productions at the time of said liquidation, including the deficiency, if any, which is the subject of this proceeding.

Feldman continued to own "Streetcar" from the time of his purchase from Group Productions (Sept. 1, 1955) until October 31, 1957,

when he sold it to petitioner for $250,000. During the period when Feldman owned "Streetcar" he did attempt, though unsuccessfully, to derive income from his interest in the film. Feldman claimed no amortization or depreciation of his investment in "Streetcar" in his tax returns for the taxable years embracing the period when he owned "Streetcar."

Upon the sale of all of the capital stock in Group Productions to petitioner, Group Productions' income became includable in petitioner's Federal corporate income tax return. Group Productions, therefore, filed a separate return for the period January 1 to September 8, 1955. In said return Group Productions reported its $250,000 gain from the sale of "Streetcar" to Feldman as long-term capital gain. Respondent asserts a deficiency of $67,500 from petitioner as transferee of the assets of Group Productions, alleging that the gain on the sale of "Streetcar" to Feldman was ordinary income and not long-term capital gain.

OPINION

The only issue here involved is whether the sale of "Streetcar" by Group Productions to Feldman produced long-term capital gain or ordinary income to the former. Section 1231(a) accords long-term capital gains treatment to property used in the trade or business if held for more than 6 months. Section 1231(b) defines such property. Respondent contends that "Streetcar" was "property of a kind which would properly be includable in the inventory of the taxpayer if on hand at the close of the taxable year," and that therefore capital gains treatment under section 1231 is blocked by section 1231(b)(1)(A). Because we are able to resolve this case on other grounds, we need not decide whether "Streetcar" was property includable in the inventory of Group Productions.

Respondent relies primarily upon section 1239 as the basis for his determination. That section provides in pertinent part as follows:

SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

   (1) between a husband and wife; or

   (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a

character which is subject to the allowance for depreciation provided in section 167.

This section would deny capital gain treatment even if capital gain might otherwise be provided for under section 1231. However, section 1239 is not applicable unless the property sold is of a character subject to depreciation under section 167 in the hands of Feldman, the transferee. Section 167 provides for a depreciation deduction for (1) property used in the trade or business, or (2) property held for the production of income.

Respondent does not argue that "Streetcar" in the hands of Feldman was property used in his trade or business; however, he does contend that it was property held for the production of income. Petitioner contends that "Streetcar" could not have been held for the production of income by Feldman because of the preexisting arrangement with Warner Bros. Petitioner states its argument (without any citations) as follows:

The agreement of March 8, 1955 between Group [Productions] and Warner Bros. prevented him [Feldman] from realizing any ordinary income from it before January 1, 1958. What he had bought was merely a right to future income, if any. There is no known method of depreciating such an asset in the present, for by its very nature it will not mature, and therefore cannot begin to depreciate, until sometime in the future.

We cannot agree. The March 8, 1955, agreement with Warner Bros. was in effect during the entire period that Feldman held title to the film. Warner Bros. had the right, until January 1, 1958, to distribute and license the showing of the film in theaters where it had not already been exhibited and to retain all receipts therefrom. It could not, however, "reissue" the picture or distribute or license its exhibition in cities here or in Canada where it had previously been shown.[2]

The record does not make clear what, if any, potential rights to income this left for Feldman. Apparently Feldman could have "reissued" the film after he purchased it in 1955 and prior to 1958, or could have licensed it in theaters or cities where it *had* previously been shown. Although Feldman's accountant testified that "Streetcar" could not yield any income to Feldman prior to 1958, Feldman himself testified as follows on cross-examination:

Q. Was any effort made to so license or rent this property?
A. Yes. There was effort on my part, to a degree, and effort on other people's part to acquire the property, but nothing came of it.

---

[2] As our findings indicate, in addition to a general prohibition against Warner's reissuance anywhere, there was a specific restriction added by rider to the contract that after 45 days from the date thereof Warner "shall not" distribute or license the showing of "Streetcar" in such cities in the United States or Canada where it had been previously exhibited.

Thus, the record before us is at best inconclusive on the question, and, the burden of proof being on petitioner, we hold that the property in the hands of Feldman was held for the production of income.

The law is well established that deductions (including depreciation) are allowable with regard to property held for the production of income or for use in a trade or business even though no income is currently being received or accrued therefrom and even though the asset is currently idle. *Kittredge* v. *Commissioner*, 88 F. 2d 632 (C.A. 2, 1937), affirming a Memorandum Opinion of this Court; *George S. Jephson*, 37 B.T.A. 1117 (1938); *Independent Brick Co.*, 11 B.T.A. 862, 869 (1928); *Connell* v. *Fahs*, an unreported case (S.D. Fla. 1953, 45 A.F.T.R. 967, 54–1 U.S.T.C. par. 9119); *Yellow Cab Co. of Pittsburgh* v. *Driscoll*, 24 F. Supp. 993 (W.D. Pa. 1938); accord, *Higgins* v. *United States*, 75 F. Supp. 252 (Ct. Cl. 1948).

We disagree particularly with the last sentence of the above-quoted excerpt from petitioner's brief. It seems to us that the capital investment in and the income-producing potential of the film *did* "mature" throughout the period it was owned by Feldman—even though it did not yield income to Feldman. Despite the fact that "Streetcar" may have been a classic which will live forever in cinema history, it would, nonetheless, diminish in value with the passage of time, because of increased exposure to public view and decreased timeliness, resulting in a decrease in potential future box office. "Streetcar" had been released since 1951 and apparently was still being exploited by Warner Bros. while Feldman held it. As was stated in *Kittredge* v. *Commissioner*, *supra* at 634, "one factory of a large industrial plant may lie idle for a year, and in fact suffer depreciation as great, or greater, than that sustained by the factories in operation."

The fact that Feldman never took any depreciation or amortization deductions for "Streetcar" while he held it lends no support to petitioner's argument. Whether or not depreciation was actually taken, it was allowable and, hence, the film was of a character subject to depreciation under section 167. Cf. *Kittredge* v. *Commissioner*, *supra*.

Petitioner relies on Rev. Rul. 60–358, 1960–2 C.B. 68, as authority for its contention that respondent would not have permitted Feldman to depreciate "Streetcar" prior to 1958, i.e., while Warner Bros. had distribution rights. That ruling provides that depreciation on television films may be computed under an "income forecast" method under which depreciation is taken only in periods in which income from the films is received. We cannot regard this ruling as persuasive authority in the instant case. It was issued in 1960, several years after both the purchase and the sale by Feldman; the ruling does not prescribe a mandatory method for depreciation but merely announces that the "income forecast" method is "an acceptable method," and finally, it

is doubtful whether the ruling is applicable to nontelevision feature films such as "Streetcar." [3]

Even if we were to agree with petitioner that Feldman could not have taken depreciation while he held "Streetcar," we would still hold that section 1239 is applicable here. The property transferred need not be depreciable by the transferee as soon as the transfer is completed; as long as the property in the hands of the transferee is *of a character* subject to the allowance for depreciation, then section 1239 applies.

Petitioner is quite persuasive in arguing that it was not within the contemplation of Congress, when the predecessor of section 1239 was enacted, that a situation like the instant one should be covered. Section 1239 is designed to prevent a taxpayer who had largely depreciated an asset against his ordinary income from selling the asset to his controlled corporation or his wife at a long-term capital gain, thus enabling his alter ego once more to take depreciation against ordinary income. House Ways and Means Committee Report, Revenue Act of 1951, H. Rept. No. 586, 82d Cong., 1st Sess., p. 120 (1951). In the instant case it is clear that double depreciation was not Feldman's motive, and in fact Feldman never took depreciation.

Respondent, however, has no sympathy for this approach since the admitted reason for the sale to Feldman was to avoid the corporation's being treated as a collapsible corporation under section 341. Section 1239 as applied by respondent in a situation such as this partially alleviates the effect of circumvention of section 341 in the manner accomplished by Feldman and Group Productions.[4]

Even though there was no attempt in the instant case to depreciate "Streetcar" twice, and whether or not section 1239 should properly be used by respondent to help prevent circumvention of section 341, the language of section 1239 is unambiguous and it is applicable in this case. We hold that "Streetcar" was property of a character subject to the allowance for depreciation in the hands of Feldman and that, therefore, the gain on the sale by Group Productions to Feldman was ordinary income and not capital gain. Having held that section 1239 is applicable, we need not decide the other question raised in the case: whether "Streetcar" in the hands of Group Productions was an asset entitled to capital gains treatment under section 1231.

*Decision will be entered for the respondent.*

---

[3] The ruling is "limited in its application to television films, taped shows for reproduction and other property of a similar character." 1960–2 C.B. at 70.

[4] Even though Feldman sold "Streetcar" eventually to Twentieth Century-Fox for the same price he paid Group Productions, and thereby avoided sec. 341 by accomplishing indirectly what could have been done more directly, respondent makes no attempt to apply sec. 341 in this case.