NATHAN TOLWINSKY, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 10835-82, 2326-83.     Filed May 28, 1986.

*Melvin E. Pearl, Rex A. Guest,* and *Glenn A. Nadell,* for
the petitioner.

*Bryan R. Sullivan* and *Thomas J. Kane*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioner's Federal income taxes of $23,999 for 1978 and $39,011 for 1979. The issues for decision are: (1) Whether the petitioner, as a limited partner in a partnership purportedly engaged in the purchase and distribution of a motion picture, is entitled to deductions for a distributive share of losses reported by the partnership and, if so, in what amounts; and (2) whether the petitioner is entitled to an investment tax credit.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Nathan Tolwinsky, maintained his legal residence in Waukegan, Illinois, at the time he filed his petitions in these cases. Dr. Tolwinsky filed his Federal income tax returns for 1978 and 1979 with the Internal Revenue Service.

EMI Limited (EMI LTD.), headquartered in London, was the parent company of British Lion, Inc. (British Lion), and of EMI Films, Inc. (EMI). The subsidiaries maintained separate bank accounts, but their funds were commingled in and drawn from a single concentration account. The subsidiaries filed consolidated tax returns. The offices of British Lion and EMI were located in Beverly Hills, California.

In 1977, EMI possessed an option to acquire "all motion picture and certain allied rights" in an original screenplay entitled "The Man Who Came to Play." The original screenplay, written by Louis Garfinkle and Quinn Redeker, had been revised and rewritten by Michael Cimino and Deric Washburn and renamed "The Deer Hunter."

On or about May 23, 1977, EMI entered into an agreement with Universal Pictures (Universal) for the production, financing, and distribution of the film "The Deer Hunter" (the production-financing-distribution agreement). Under that agreement, EMI agreed to exercise its option to acquire the motion picture and allied rights in the literary material and to produce the film. The final screenplay, final budget,

and production schedule were subject to Universal's approval. After the director and EMI exercised their rights to cut and edit the motion picture, Universal had the right to cut, edit, alter, delete, add to, or otherwise change the motion picture. Both parties were to contribute to the production costs: Universal agreed to reimburse EMI, on a weekly basis, for one-half of the total direct cost of the motion picture, plus an amount equal to 16 percent of such one-half of the direct cost, but in no event, was Universal obligated to reimburse EMI for more than $4,220,000; EMI agreed to furnish all funds necessary to produce the motion picture in excess of Universal's commitment.

The production-financing-distribution agreement further provided that EMI granted to Universal exclusive and perpetual distribution rights to the motion picture "in all media by any manner and means now known or later developed," including television, in the "Distribution Territory." However, EMI expressly retained music publishing rights, the right to make commercial phonograph records or tapes of the sound track, publishing rights (with the exception that Universal was entitled to publish, for advertising purposes only, synopsis, novelizations, and other adaptations based on the motion picture or its underlying literary material), and the right to use or license the use of remake, sequel, special, or television series rights in the motion picture or in its underlying literary material. The "Distribution Territory" was defined as the United States and its territories and possessions, Canada, and ships, planes, and armed forces installations, flying the flag of the United States or Canada.[1] The "net profits," if any, derived by Universal from the distribution of "The Deer Hunter" were to be divided equally between EMI and Universal, with the exception that Universal was entitled to retain for its own account the first $250,000 of net profits in excess of the first $2 million of net profits. "Net profits" were defined essentially as Universal's "accountable gross" (i.e., Universal's receipts, including net sums received by Universal from the settlement of or as a judgment in litigation resulting from any claims for infringement of the film) less

---

[1] Because all of the transactions related herein involved such territory, we shall refer to such territory as "the United States and Canada" throughout our opinion.

Universal's distribution fee (30 percent, except 15 percent for "outright sales") and distribution expenses, and less an amount, to be retained by Universal, equal to the amount contributed by Universal toward the production cost of the film.

The production-financing-distribution agreement granted Universal exclusive control over the distribution, exploitation, marketing, reissuing, and sale or other disposition of the film in the distribution territory, but under a supplemental agreement dated July 5, 1977, Universal agreed, among other things, not to sell the film outright in connection with its theatrical release so long as Universal had its own releasing organizations in the distribution territory. Universal could assign the production-financing-distribution agreement to its parent company (Universal City Studios, Inc.) or to any company with or into which Universal might be merged or consolidated or to any company controlling, controlled by, or under the common control of Universal. EMI's right to assign the contract was limited to a right to assign its percentage share of the motion picture's net profits.

EMI commenced filming "The Deer Hunter" sometime in the spring or summer of 1977 and completed filming by the end of 1977. EMI budgeted the direct production costs of the motion picture at $6,845,251, but the final direct production costs actually amounted to approximately $11,900,000. Pursuant to the production-financing-distribution agreement, Universal advanced $4,220,000 to EMI.

EMI delivered the completed motion picture and synchronized sound negative to the laboratory of Technicolor, Inc. (Technicolor), in Los Angeles. The negative could not be removed from Technicolor without the approval of Universal. Both EMI and Universal had the right to obtain positive prints of the film and duplicating material from Technicolor.

In the early months of 1978, EMI came under increasing financial pressure because its film program had gone over budget. To raise cash and to reduce its financial exposure on its investment in the film program, EMI and its parent company, EMI LTD., engaged in negotiations with several representatives of tax shelter investment groups. EMI LTD. rejected the proposals of such representatives as unfavor-

able to it and to EMI. Subsequently, in May 1978, Michael Deeley, the president of EMI, attended the Cannes Film Festival and there met a prior acquaintance, Peter Strauss. Mr. Deeley was aware that Mr. Strauss, as an executive vice president of Allied Artists Pictures Corp., had previously been involved in the arrangement of post-production "tax shelter deals" for motion pictures. Mr. Deeley asked Mr. Strauss if he knew of anyone who would be able to enter into an agreement with EMI for the purchase[2] of three movies ("The Deer Hunter," "Death on the Nile," and "Convoy") on short notice and on terms more favorable to EMI than those proposed earlier by tax shelter representatives. Mr. Strauss mentioned the name of Melvin Pearl and agreed to contact him.

Melvin Pearl, an attorney, was a partner in the Chicago law firm of Katten, Muchin, Gitles, Zavis, Pearl & Galler[3] (Katten, Muchin). Since its formation in 1974, Katten, Muchin has had a close relationship with the Balcor Co. (Balcor).[4]

Balcor was a partnership primarily engaged in the syndication of real estate investments. Its partners were an insurance company and RGF-Balcor Associates (RGF), another partnership. RGF was composed of about nine partners, including Jerry M. Reinsdorf, the chairman of Balcor and an attorney "of counsel" to Katten, Muchin.

Mr. Pearl first became involved in the motion picture business in 1971 or 1972, when he negotiated the production of a movie for a legal client and arranged to finance the production through a limited partnership. Subsequently, he, Mr. Reinsdorf, and Mr. Reinsdorf's partners in RGF decided to engage in the syndication of motion picture investments. RGF and Mr. Pearl organized motion picture production service partnerships prior to 1976 (and the enactment of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520). In 1977, RGF and Mr. Pearl, as nominee for Katten, Muchin, formed an Illinois general partnership named "TBC Films"

[2]Use of such terms as "acquisition," "purchase," "sale," "license," "own," "interest," "principal," and "price" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved.

[3]The law firm is now named Katten, Muchin, Zavis, Pearl & Galler.

[4]The Balcor Co. has since been acquired by American Express and is now known as Balcor American Express.

to engage in the negotiation, organization, and promotion of motion picture "negative pickup" limited partnerships of the kind involved in the present case. By the summer of 1978, TBC Films had syndicated about 8 to 10 such partnerships.

Neither TBC Films nor the limited partnerships had any employees. Mr. Pearl and other members of Katten, Muchin, the partners in RGF, and the employees of Balcor conducted the partnerships' affairs. When TBC Films was first formed, both Mr. Pearl and Mr. Reinsdorf participated in negotiations for the acquisition of motion pictures. Once they developed the basic format, or structure, of such acquisitions, Mr. Pearl undertook sole responsibility for the location of suitable motion pictures and the negotiation of the terms of their purchase. The partners of RGF and the employees of Balcor were responsible for the formation, syndication, and administration of limited partnerships to acquire the motion pictures. The structure of the motion picture investment involved in the present case was typical of those promoted by TBC Films.

In selecting motion pictures for TBC Films' limited partnerships, Mr. Pearl chose only films which had important producers and well-known casts and which were assured of distribution by prominent distribution companies. In negotiating the terms of a purchase, he always insisted that the limited partnership receive an income interest based on the gross receipts reported by the distributor, rather than on the net receipts of the distributor, because he felt a gross position was more likely to generate income; a net position would have allowed the distributor to recoup all distribution expenses and fees before sharing any receipts with the partnership.[5] Several of the motion picture partnerships formed by Mr. Pearl have returned a profit to their investors.

Mr. Strauss contacted Mr. Pearl in May 1978 and informed him that "The Deer Hunter" was available.[6] He

---

[5]Whether a gross position was in fact more favorable than a net position depended upon a number of factors, including: the percentage of gross receipts to which the partnership was entitled and the threshold level of gross receipts to be reached before the partnership was entitled to begin receiving its percentage share.

[6]The negotiations described here also encompassed the motion pictures "Death on the Nile" and "Convoy." TBC Films eventually syndicated "Death on the Nile" through a limited partnership, but "Convoy" was not acquired because it was released in the United States and

described its cast and budget and outlined the details of EMI's distribution agreement with Universal, including Universal's intention to spend several million dollars for prints and advertising. Sometime thereafter, Mr. Strauss provided Mr. Pearl with a copy of the motion picture's script and introduced Mr. Pearl to Mr. Deeley of EMI. Negotiations ensued, and by the end of June 1978, the parties to the transactions agreed on all major terms as described below. Mr. Pearl viewed the motion picture at a "sneak preview" show in Chicago in August 1978.

On or about September 26, 1978, representatives of the contracting parties met in New York City and executed the following documents (among others): (1) An assignment of the production-financing-distribution agreement; (2) an EMI-Great Lakes acquisition agreement; (3) a Great Lakes-Lionel acquisition agreement; (4) a Lionel note; and (5) a British Lion distribution agreement.

By means of the first document, EMI assigned to British Lion, its sister company, all of EMI's rights under its production-financing-distribution agreement with Universal. Universal approved such assignment and agreed to make all payments and to render all statements due under the production-financing-distribution agreement to British Lion, but Universal did not relieve EMI (and its affiliated companies) of its obligations under such agreement.

The EMI-Great Lakes acquisition agreement was entered into by EMI and Great Lakes Holding Co., Est. (Great Lakes), a Lichtenstein corporation, and, by its terms, EMI sold and conveyed to Great Lakes all of its right, title, and interest in the motion picture "The Deer Hunter" in the United States and Canada:

and the literary, dramatic and musical material which is contained therein, including an undivided interest in the original camera negative and all physical materials of and in respect thereto (subject to the rights therein of Universal Pictures under the Universal Distribution Agreement * * * ) and any and all copyrights and rights to obtain copyrights and renewals and extensions of copyright throughout the Territory in, to and with respect to the picture.

---

Japan before a purchase could be consummated, making it unsuitable for syndication (apparently because of the unavailability of the investment tax credit).

However, EMI expressly retained the exclusive rights to remakes, sequels, and television productions based upon the motion picture. EMI warranted, among other things, that (1) it was the exclusive owner of the picture and the material on which it was based, (2) it had not previously sold or granted to any third party any right to the material or picture, or the distribution thereof, the negative or other physical materials thereof, or the copyright, except those distribution rights granted to Universal under the production-financing-distribution agreement, (3) it had irrevocably assigned to British Lion "all of its rights, title and interest in and to" the production-financing-distribution agreement, (4) it was not in default under the production-financing-distribution agreement, (5) the direct production costs of the picture were not less than $12 million, (6) the picture had not been commercially exhibited or exploited previously, but it was booked by Universal for public exhibition for at least one week in 1978, and (7) the copyright notice on the picture would be held and retained by EMI for the equitable benefit of Great Lakes, its successors, and assigns. Paragraph 4 of the agreement provided:

4. In full consideration for the sale of the picture and the material by Seller [EMI] to Purchaser [Great Lakes] and for all of Seller's undertakings hereunder, Purchaser shall pay Seller the following:

(a) The sum of $1,225,000 payable as follows: $550,000 concurrently with the execution hereof, receipt of which is hereby acknowledged, and $675,000 on or before March 1, 1979; and

(b) All monies received from the sale or other disposition of the Picture and all rights therein received by Purchaser, whether from the distributor of the Picture or from any other third party, payable immediately upon receipt thereof.

To secure its obligation to pay EMI $675,000 on March 1, 1979, Great Lakes granted EMI a security interest in the motion picture and a mortgage on the copyright.

Under a letter agreement (the side letter agreement) dated September 26, 1978, EMI agreed to pay Great Lakes an amount equal to 4 percent of certain receipts actually received by EMI or its affiliates from the exploitation of "The Deer Hunter" in all media outside the United States and Canada. They subsequently agreed to a cap of $325,000

on such payments, and, in 1979, EMI paid Great Lakes a total of $325,000.

Under the Great Lakes-Lionel acquisition agreement, Great Lakes conveyed to Lionel American Corp. (Lionel), an Illinois corporation, all of the rights that it had received from EMI. The Great Lakes-Lionel acquisition agreement was identical in all material terms to the EMI-Great Lakes acquisition agreement with the exception of the paragraphs regarding the purchase price and its payment, which provided:

4. In full consideration for the sale of the picture and the material by Seller [Great Lakes] to Purchaser [Lionel] and for all of Seller's undertakings hereunder, Purchaser shall pay Seller a purchase price of $8,100,000 payable as follows:

(a) The sum of $250,000 payable concurrently with the execution hereof, receipt of which is hereby acknowledged;

(b) The sum of $675,000, payable on or before March 1, 1979;

(c) The sum of $7,175,000 to be payable only out of the proceeds of the picture, as hereinafter provided, which payment shall be secured by a non-recourse promissory note (hereinafter referred to as the "Note") in the principal amount of $7,175,000 (which shall bear interest at the rate of nine percent (9%) per annum), executed by Purchaser in favor of Seller * * * . The Note shall be payable as follows: Interest in the amount of $300,000 shall be payable concurrently with the execution hereof, receipt of which is hereby acknowledged, said payment covering interest on the Note for a portion of 1979. Interest for the remainder of 1979 in the amount of $560,000 shall be due and payable on December 31, 1979. Principal installments, each in the amount of $750,000, shall be shall be [sic] due and payable on or before the 31st day of each December in 1980, 1981 and 1982. Principal installments, each in the amount of $1,231,250 shall be due and payable on or [before] the 31st day of December in 1983, 1984 and 1985. The final installment of $1,231,250 shall be due and payable on December 31, 1986. Interest, including any accrued and unpaid interest, shall be payable with each installment of principal. All payments in respect of the Note shall be applied first to the accrued and unpaid interest and then against unpaid principal. * * * If and to the extent Purchaser has not received sufficient receipts pursuant to paragraph 6 below to make the required payments in respect of the Note by the scheduled due dates, such unpaid portion of such payment shall be deferred, but in any event the unpaid principal balance of the Note and all accrued interest thereon shall become due and payable on December 31, 1986. * * *

5. Concurrently with the execution of this agreement, Purchaser and British Lion are executing and delivering a distribution agreement * * * (hereinafter referred to as the "Master Distribution Agreement") [the British Lion distribution agreement], pursuant to which

British Lion has been granted certain distribution rights in respect of the picture and an additional motion picture entitled "Death on the Nile". The term "Purchaser's receipts" as used herein, shall mean the aggregate of all moneys received by Purchaser from Distributor pursuant to the Master Distribution Agreement solely in respect of the picture.

6. That portion of the Purchaser's receipts represented by the payments referred to in Paragraph 9(a)(II) [level II] of the Master Distribution Agreement shall be paid by Distributor to Purchaser, then by Purchaser to Seller on account of Purchaser's obligations to pay interest on and the principal amount of the remaining balance of the purchase price as provided in Paragraph 4(c) hereof. That portion of Purchaser's receipts represented by the payments referred to in Paragraph 9(a)(I) [level I] of the Master Distribution Agreement, shall be retained by Purchaser. It is acknowledged and agreed that Seller shall have no right whatsoever in the portion of Purchaser's receipts retained by Purchaser as set forth above; nor may they be diminished in any way by Seller's having to expend any moneys in enforcing or supporting any of the provisions hereof except Purchaser's obligations to pay the amounts set forth in Paragraphs 4(a) and (b) hereof.

Pursuant to such agreement, Lionel executed a $7,175,000 nonrecourse promissory note (the Lionel note), bearing interest at the rate of 9 percent per annum, and payable to Great Lakes in installments of principal and interest as described in paragraph 4(c) of the Great Lakes-Lionel acquisition agreement. The Lionel note was secured by the motion picture and a mortgage on the copyright.

Lionel also entered into a distribution agreement with British Lion (the British Lion distribution agreement) relating to the motion pictures "The Deer Hunter" and "Death on the Nile." Under such agreement, Lionel granted to British Lion "the sole and exclusive right to distribute, exhibit, rent, advertise, license, make outright or flat sales, exploit, transmit, perform, release, reissue, rerun, subdistribute, sublicense and otherwise market each of the Pictures by any and all means and media and through all systems, processes or devices whether now known, or hereafter discovered or invented," throughout the United States and Canada. The grant of such rights was for a term of 15 years, which was automatically renewed in perpetuity unless Lionel within 60 days prior to the end of the 15-year period advised British Lion of Lionel's intention to terminate. In the event that Lionel gave British Lion notice of its intention to terminate, British Lion had the right to renew the agreement in perpetuity by paying Lionel the

motion picture's fair market value at such time but in no event less than $2,500 ·nor more than $7,500. Any amount paid by British Lion to renew the agreement was recoupable by British Lion out of any future amounts due Lionel under the distribution agreement.

Under paragraph 4 of the British Lion distribution agreement, British Lion acknowledged that its "affiliated compan[y]," EMI, had previously entered into the production-financing-distribution agreement with Universal and that all of EMI's rights under the agreement (referred to as a "subdistribution" agreement) had been assigned to British Lion. British Lion agreed not to amend or terminate the production-financing-distribution agreement "in any manner whatsoever that will materially affect the economic benefits or legal rights or remedies to which Owner [Lionel] is entitled under this Agreement without the prior written consent of Owner." British Lion further agreed to make no material changes in the motion picture without consulting Lionel, but British Lion had the final decision on such matters in the event of a disagreement.

In return for the distribution rights granted to it, British Lion consented to pay Lionel a license fee divisible into three components, or "levels." Under level I, Lionel was to be paid, on a quarterly basis, an amount equal to the following percentages of the "gross receipts" of "The Deer Hunter":

| Gross receipts | Percentage | Payment |
|---|---|---|
| First $5,000,000 | 0 | 0 |
| Next $1,000,000 | 10.0 | $100,000 |
| Next $2,000,000 | 12.5 | 250,000 |
| Next $2,000,000 | 16.0 | 320,000 |
| Next $2,000,000 | 17.75 | 355,000 |
| Next $1,000,000 | 20.0 | 200,000 |
| Next $2,000,000 | 4.0 | 80,000 |
| Next $2,000,000 | 5.5 | 110,000 |
| Next $2,600,000 | 6.0 | 156,000 |
| In excess of $19,600,000 | 4.0 | - - - |

In addition, in the event that Lionel did not receive $735,000 under level I within 36 months of the motion picture's release, Lionel was entitled to receive, in addition to any amounts otherwise received under level I, the lesser of 100 percent of the gross receipts or the difference between the amounts already received by Lionel under level I and $735,000.

Under level II, British Lion agreed to pay Lionel an amount equal to 80 percent of the first $5,900,000 of gross receipts remaining after the deduction of level I payments and, thereafter, an amount equal to 50 percent of such remaining gross receipts until such time as Lionel had received an amount sufficient to pay in full the principal and interest due on the Lionel note. However, under a holdback schedule, Lionel was in no event entitled to be paid pursuant to level II more than $560,000 in 1979, $750,000 (plus interest at the rate of 9 percent per annum on the unpaid balance of the Lionel note) in each of the years 1980 through 1982, or $1,231,250 (plus such interest) in each of the years 1983 through 1986.

For purposes of level I and level II, the term "gross receipts" was defined as all amounts reported by Universal to British Lion as "accountable gross" pursuant to the production-financing-distribution agreement plus all gross amounts received by British Lion (or an ultimate distributor) from exploitation of the motion picture other than through Universal. Thus, "gross receipts" bore no relation to the amounts actually paid to British Lion by Universal pursuant to the production-financing-distribution agreement.

Under level III, Lionel was to be paid by British Lion out of the gross receipts received by British Lion after the Lionel note was paid in full, and in lieu of payments under levels I and II, an amount equal to 100 percent of the "net profits" of "The Deer Hunter." However, in no event was the amount payable under level III to be less than the amount that would otherwise be payable under level I. The term "net profits" was defined as the gross receipts received by British Lion after the Lionel note was paid in full less: (1) British Lion's distribution fee, an amount equal to 30 percent of the first $30 million of gross receipts "from the first dollar" and 10 percent of the gross receipts thereafter, (2) any and all distribution expenses not otherwise deductible or deducted pursuant to the terms of the British Lion distribution agreement, and (3) an amount equal to 7 percent of gross receipts "from the first dollar of Gross Receipts reported," payable to EMI "as and for its contingent compensation as producer of the Picture."

All payments due Lionel under the British Lion distribution agreement were to be paid without regard to the terms of the production-financing-distribution agreement with Universal,

it being understood and agreed that the payments due under * * * [levels I, II, and III] shall be computed, based upon and paid in connection with the Gross Receipts reported to Distributor pursuant to the * * * [production-financing-distribution agreement] and regardless of whether any sums are in fact due, paid, or to become due, to Distributor pursuant to such * * * [agreement].

By letter directed to Great Lakes and Lionel, EMI LTD. agreed to insure EMI's fulfillment of the warranty and indemnification provisions of the EMI-Great Lakes acquisition agreement and British Lion's payment obligations to Lionel under levels I and III of the British Lion distribution agreement. EMI LTD's liability under such undertaking was limited to $1,500,000 plus any moneys received by British Lion from Universal under the production-financing-distribution agreement.

In addition, EMI and British Lion granted Lionel a security interest in certain collateral to secure British Lion's performance under the British Lion distribution agreement. The collateral consisted of all the interest of EMI and British Lion (collectively referred to as the "Debtor") in (1) the production-financing-distribution agreement, (2) all distribution agreements thereafter entered into by the Debtor relating to the picture in the United States and Canada, and (3) all proceeds from the agreements referred to in (1) and (2) to which Lionel was entitled under levels I and III of the British Lion distribution agreement, subject, however, to paragraph 6 of the Great Lakes-Lionel acquisition agreement. Lionel's rights as a secured party, including its right to foreclose against the collateral, were subordinate to the rights of distributors, subdistributors, and licensees of EMI and British Lion with respect to the motion picture. Furthermore, Lionel was not entitled to foreclose until EMI and British Lion had exhausted their remedies against EMI LTD pursuant to its agreement to insure the performance of the obligations of British Lion under levels I and III.

Sometime after the execution of the documents described above, Lionel entered into an acquisition agreement with

Hart Associates, Ltd. (Hart), dated September 27, 1978 (the Lionel-Hart acquisition agreement)'. Hart is the limited partnership whose claimed losses are at issue here. Under the agreement, Lionel conveyed to Hart all of the rights relating to the motion picture that Lionel had acquired from Great Lakes, except that Lionel retained "the sole and exclusive right to sell or license the picture for free non-network television exhibition in the United States and Canada ('television syndication') and to engage in any and all activity relating to the picture with respect to television syndication." By separate document, Lionel also assigned to Hart all of Lionel's rights under the British Lion distribution agreement.

Hart agreed to pay Lionel a total of $8,110,000, or $10,000 more than Lionel had agreed to pay Great Lakes. The Lionel-Hart acquisition agreement provided for payment of the purchase price in the following manner:

5. * * *

(a) The sum of $250,000 payable concurrently with the execution hereof, receipt of which is hereby acknowledged;

(b) The sum of $685,000 payable on or before March 1, 1979;

(c) The sum of $7,175,000 to be payable only out of the proceeds of the picture, as hereinafter provided, which payment shall be evidenced by a promissory note (hereinafter referred to as the "Note") in the principal amount of $7,175,000 (which shall bear interest at the rate of nine percent (9%) per annum), executed by Purchaser in favor of Seller * * * The Note shall be payable as follows: Interest in the amount of $300,000 shall be payable concurrently with the execution hereof, receipt of which is hereby acknowledged, said payment covering interest on the Note for a portion of 1979. Interest for the remainder of 1979 in the amount of $560,000 shall be due and payable on December 31, 1979. Principal installments, each in the amount of $750,000, shall be due and payable on or before the 31st day of each December in 1980, 1981 and 1982. Principal installments, each in the amount of $1,231,250, shall be due and payable on or before the 31st day of December in 1983, 1984 and 1985. The final installment of $1,231,250 shall be due and payable on December 31, 1986. Interest, including any accrued and unpaid interest, shall be payable with each installment of principal. All payments in respect of the Note shall be applied first to the accrued and unpaid interest and then against unpaid principal. The principal amount of the Note and the interest thereon, as the same shall accrue, are hereinafter referred to as the "remaining balance of the purchase price." Subject to subparagraph 5(d), Purchaser's obligation to repay the remaining balance of the purchase price shall be limited to the payment thereof out of such portions of the Purchaser's receipts as provided in Paragraph 6(b) hereof

and in no event shall Purchaser have any other obligation or liability to pay such balance nor may any deficiency judgment be obtained against Purchaser for the payment thereof. If and to the extent Purchaser has not received sufficient receipts pursuant to Paragraph 6(b) below to make the required payments in respect of the Note by the scheduled due dates, such unpaid portion of such payment shall be deferred, but in any event the unpaid principal balance of the Note and all accrued interest thereon shall become due and payable on December 31, 1986;

(d) Notwithstanding the provisions of subparagraph (c) above, it is understood and agreed that if and to the extent any principal or interest remains unpaid on the Note on December 31, 1986, then Seller shall have full recourse therefore against the General Partners [sic] of the Purchaser, and the Limited Partners thereof by virtue of their execution of Assumption Agreements in the form attached hereto as Exhibit "B", it being understood and agreed that such recourse against each such Partner shall be limited to the "Maximum Liability" set forth in the Assumption Agreements signed by such Partner and that the liability of the General Partners [sic] and the Limited Partners under such Assumption Agreements shall be several and not joint and shall, in all respects, be subject to the terms and conditions of said Assumption Agreements; *provided, however,* that at such time as the Purchaser has paid to the Seller out of rentals on the picture the sum of $4,750,000 in respect of the Note (principal and/or interest), then the provisions of this subparagraph (c) [sic] shall be of no further force and effect, the liabilities of the Partners under the Assumption Agreements shall cease and terminate forthwith, and Seller's sole recourse on the Note for the remaining principal and/or interest thereon shall be limited to the amounts set forth in subparagraph (c) above, and neither Purchaser nor the partners of Purchaser shall have any other obligation or liability on the Note;

     \*     \*     \*     \*     \*     \*     \*

6. (a) The term "Purchaser's receipts", as used herein shall mean the aggregate of all monies received by Purchaser from British Lion pursuant to the * * * [British Lion] Distribution Agreement solely in respect of the picture;

(b) That portion of the Purchaser's receipts represented by the payments referred to in Paragraph 9(a)(II) [level II] of the * * * [British Lion] Distribution Agreement shall be paid to Seller on account of Purchaser's obligations to pay interest on and the principal amount of the remaining balance of the purchase price as provided in Paragraph 5(c) hereof. All other Purchaser's receipts, including, without limitation, that portion represented by the payments referred to in Paragraph 9(a)(I) [level I] of the * * * [British Lion] Distribution Agreement, shall be retained by Purchaser. It is acknowledged and agreed that subject only to Paragraph 5(d) hereof, Seller shall have no right whatsoever in the portion of Purchaser's receipts retained by Purchaser as set forth above; nor may such portion be diminished in any way by Seller's having to expend any monies in enforcing or supporting any of the provisions

hereof except Purchaser's obligations to pay the amounts set forth in Paragraphs 5(a) and (b) hereof.

In accordance with such agreement, Hart executed a $7,175,000 nonrecourse promissory note (the Hart note), bearing interest at the rate of 9 percent per annum, and payable to Lionel in installments of principal and interest as described in paragraph 5(c) of the Lionel-Hart acquisition agreement. The Hart note further provided that:

> This Note is issued pursuant to and subject to all of the terms and conditions of, the Acquisition Agreement and is entitled to the benefits thereof. As set forth in Paragraph 5(d) of the Acquisition Agreement, the General Partner of the maker and the Limited Partners thereof have agreed to become personally liable in respect of this Note in the event and to the extent such Note is not paid in full on December 31, 1986, the obligations and liabilities of the General Partner and such Limited Partners being in all respects subject to the provisions of said Paragraph 5(d) of the Acquisition Agreement and the Assumption Agreements therein described. This Promissory Note is executed on the express condition, and the payee hereof by its acceptance of this Note so agrees, that as set forth in Paragraph 5(d) of the Acquisition Agreement, at such time as maker has made payments on this Note out of the rentals received by the maker from the Film, which is the subject of the Acquisition Agreement, described therein, in the total amount of $4,750,000 (principal and/or interest), then all personal liability of the General Partner and such Limited Partners hereon shall cease and terminate forthwith, and be of no further force and effect and this Note shall thereafter be a non-recourse Note payable only out of certain monies received by maker as herein and in the Acquisition Agreement described.

The Hart note was secured by the motion picture and by an assignment and mortgage of the copyright.

Pursuant to each of the three acquisition agreements described above, each seller delivered an assignment of copyright to its respective purchaser, and each purchaser delivered a mortgage and assignment of copyright to its respective seller as security for the amounts due under the acquisition agreement. All of such documents were recorded with the Copyright Office of the United States. In addition, a financing statement was filed with the appropriate State official for each security interest granted by the parties.

By checks dated September 25, 1978, Lionel paid Great Lakes $250,000 pursuant to paragraph 4(a) of the Great Lakes-Lionel acquisition agreement as the first installment of the purchase price of "The Deer Hunter" and $300,000

pursuant to paragraph 4(c) of such agreement as prepaid interest on the Lionel note. Great Lakes endorsed both checks to the order of EMI. On September 28, 1978, Hart transferred $550,000 from its bank account to Lionel's account at the same bank. Hart treated $250,000 of such amount as its first installment of the purchase price due under paragraph 5(a) of the Lionel-Hart acquisition agreement, and it treated the remaining $300,000 as a payment of the prepaid interest due under paragraph 5(c) of such agreement. In February 1979, Hart paid Lionel $10,000 and, pursuant to an authorization executed by Lionel, sent EMI a check for $675,000, made payable to Great Lakes, in satisfaction of both Lionel's obligation to Great Lakes under paragraph 4(b) of the Great Lakes-Lionel acquisition agreement and Hart's obligation to Lionel under paragraph 5(b) of the Lionel-Hart acquisition agreement. EMI deposited the check in an account under Great Lake's name at Bank of America, and the funds were then immediately transferred to EMI's account at the same bank.

EMI set up "blocked" or "zero balance" accounts for Great Lakes and Hart at Bank of America to insure that payments made by British Lion to Hart (as assignee of Lionel) under level II of the British Lion distribution agreement would immediately return to EMI pursuant to the terms of the EMI-Great Lakes, Great Lakes-Lionel, and Lionel-Hart acquisition agreements. The level II payments exactly matched the principal and interest payments due on the Lionel and Hart notes, as outlined below:

| Year | Maximum level II payment | Note payment due |
|------|--------------------------|------------------|
| 1979 | $560,000 | $560,000 (interest) |
| 1980-1982 | $750,000 + 9% interest on unpaid balance of Lionel note | $750,000 (principal) + 9% interest on unpaid balance of notes |
| 1983-1986 | $1,231,250 + interest | $1,231,250 (principal) + interest |

Hart issued an irrevocable letter of instruction to Bank of America advising the bank that British Lion periodically would deposit funds to Hart's account and that such funds should be transferred immediately to Great Lakes' account. Great Lakes issued a similar irrevocable letter of instruction

authorizing the bank to transfer any deposits to its account immediately to EMI's account. Lionel issued a letter to Hart acknowledging that funds deposited by British Lion to Hart's blocked account (and routed thereby to EMI) constituted payments on the Hart note.

The inclusion of Great Lakes and Lionel in the transactions described above resulted from the format developed by Mr. Pearl and Mr. Reinsdorf in 1977 for TBC Films' motion picture negative pickup syndications. Mr. Pearl informed Mr. Strauss during their negotiations that the investors that Mr. Pearl represented did not wish the same company to be both the seller and the distributor of the motion picture. Mr. Strauss relayed this information to Mr. Deeley, who later advised Mr. Strauss that Great Lakes was set up to accommodate Mr. Pearl's request. Mr. Strauss viewed Great Lakes as merely a "middleman" or "pass-through," and the finance director of EMI LTD., John Chambers, thought of Great Lakes' role as that of an "intermediary" introduced "at the request of the tax investors."

The record does not establish the owner or owners of Great Lakes. During negotiations with respect to the Great Lakes-Lionel acquisition agreement, Mr. Pearl and Lionel's attorney, David Nochimson, dealt principally with Mr. Deeley, Mr. Strauss, Norma Jackson (the corporate secretary of EMI and British Lion), and to some extent, Andrew Boose (EMI's attorney in New York). Jolyon Stern executed the EMI-Great Lakes and Great Lakes-Lionel acquisition agreements on Great Lakes' behalf at about the time of the September 26, 1978, closing in New York. According to an affidavit executed by Thomas Wartmann and presented by someone at the New York closing, Mr. Stern was authorized to sign such documents. In his affidavit, Dr. Wartmann stated that he was a member of the board of directors of Great Lakes. He was also an attorney with the law firm of Konig & Meyer, located in Zurich, Switzerland. Neither Mr. Stern nor Dr. Wartmann attended the New York closing or testified in this case. Mr. Strauss, Mr. Deeley, Mr. Chambers, Mr. Boose, and Mr. Pearl did testify, but all denied knowing who owned Great Lakes. The $325,000 paid Great

Lakes pursuant to its side letter agreement with EMI was sent to the office of Konig & Meyer in Switzerland.

The interposition of Lionel between EMI and Hart was also a part of the format employed by TBC Films. Lionel was wholly owned by its president, Sanford Takiff, a friend and former law school classmate of both Mr. Pearl and Mr. Reinsdorf. Although it had previously engaged in the steel-importing business, the company was inactive in 1975 and 1976. In 1977, Mr. Pearl and Mr. Reinsdorf asked Mr. Takiff to take part in TBC Films' motion picture investments. Lionel's role was to purchase a motion picture for cash and a nonrecourse promissory note and simultaneously to license its distribution. Lionel promptly resold the motion picture and assigned the distribution agreement to a limited partnership formed by TBC Films for cash and a nonrecourse note backed by assumption agreements. Lionel's "fee" for serving as an intermediary was the difference between the amount of cash that it received from the partnership and the amount of cash that it paid to the film's owner. Occasionally, Lionel also retained the right to television syndication revenues. In the present case, Lionel received a $10,000 fee and the right to syndication revenues.

Lionel assumed no genuine risk by participating in TBC Films' ventures. Balcor, the marketing agent for TBC Films, was always able to fully fund the partnerships that it syndicated. In addition, Lionel executed only nonrecourse notes, and on all but two occasions, it was paid by the partnerships either before or at the time that it paid the owners of the motion pictures. On one occasion, Lionel was not reimbursed for about a week because the partnership's first check was returned by the bank, and on a second occasion, Lionel was not reimbursed for 2 or 3 weeks because the partnership was not formed until that time. On the second occasion, Mr. Takiff borrowed the money needed for the cash payment and lent the money to Lionel. According to its Federal income tax return for its fiscal year ending June 30, 1979, Lionel had total assets (after depreciation) of only $18,945. The company had no bank lines of credit in 1978.

The only motion picture investments in which Lionel

participated were those promoted by Mr. Pearl. Mr. Takiff took no part whatsoever in negotiating the terms of Lionel's agreements relating to "The Deer Hunter"; Mr. Pearl negotiated all financial terms of the acquisition and distribution agreements on behalf of Lionel and Hart.

The purchase price for the film and the manner of its payment were negotiated primarily by Mr. Pearl and Mr. Strauss and then approved by EMI and EMI LTD Mr. Pearl suggested most of such terms, based on TBC Films' negative pickup format. The total purchase price due Great Lakes of $8.1 million was established by application of a rule-of-thumb: when buying only the United States and Canadian rights to a motion picture, Mr. Pearl always negotiated a price equal to 60 to 65 percent of the picture's total production costs because, typically, about 60 to 65 percent of a picture's distribution revenues derived from the United States and Canada. EMI was unconcerned about the amount of the total purchase price for "The Deer Hunter"; it was interested only in the amount that it would be paid in cash, up front, and the amount that it would owe, through British Lion, pursuant to the British Lion distribution agreement. It was interested in the size of Lionel's nonrecourse note only insofar as its payment might pave the way for British Lion's obligation to make payments under level III of the distribution agreement. Mr. Pearl also suggested use of the holdback schedule of level II and the correlating payment terms of paragraph 4(c) of the Great Lakes-Lionel acquisition agreement and the Lionel note. EMI approved the schedule of payments due under level II and the Lionel note because the money paid out under level II would immediately return to EMI pursuant to the Great Lakes-Lionel acquisition agreement and the Lionel note.

Hart was organized as an Illinois limited partnership in 1978. The partnership had one general partner, TBC Films, and 28 limited partners. A total of $1,610,000 was contributed to the capital of Hart, of which amount $635,950 was contributed in 1978 and $974,050 was contributed in 1979. TBC Films made no capital contribution. The limited partners subscribed for a total of 1,610 "limited partnership interests" at a price of $1,000 each, payable in installments of $395 on subscription and $605 on February 15, 1979.

The petitioner, Dr. Tolwinsky, acquired 46 limited partnership interests on August 21, 1978. Incident to acquiring such interests, he signed an assumption agreement whereby he agreed, in pertinent part:

that if and to the extent rentals from the Film received by the Partnership from time to time are insufficient to enable the Partnership to pay in full any principal of or interest on the * * * [Hart note] when and as the same becomes due and payable on December 31, 1986, then the undersigned shall contribute to the Partnership by way of a capital contribution, such amounts as shall be necessary to enable the Partnership to make such payments on such Debt, PROVIDED HOWEVER, IN NO EVENT SHALL THE UNDERSIGNED'S LIABILITY HEREUNDER EXCEED A TOTAL MAXIMUM AMOUNT OF $115,000 (the "Maximum Liability").

It is further understood and agreed that the undersigned's obligations hereunder shall be a primary obligation of the undersigned, and that the undersigned shall have no right of indemnification from or contribution or subrogation against the Partnership, the General Partner thereof or any other person (other than any rights of contribution which the undersigned may have against other Partners who have executed agreements of the same nature as this Agreement) it being the intention and understanding of the undersigned that, to the extent of the Maximum Liability, the undersigned shall bear the ultimate risk of loss if and to the extent the Partnership is unable to make payments on the * * * [Hart note] when due, as aforesaid.

In order to effectuate the agreements set forth herein, the undersigned further agrees as follows:

1. If and when the undersigned shall have received notice from the Partnership that any payments on the * * * [Hart note] have become due and payable (whether by virtue of demand by the obligee of said Debt, expiration of the time or otherwise) and that the Partnership has not received sufficient rentals from the Film to make such payments, then the undersigned shall immediately pay over to the Partnership, for application against said Debt, all unpaid amounts then due and owing on said Debt, up to but not exceeding in total the Maximum Liability.

2. The undersigned agrees that the terms of this Agreement shall redound to the benefit of * * * [Lionel] and that * * * [Lionel] may proceed directly against the undersigned pursuant hereto, subject to the terms hereof, provided, however, that in no event shall the undersigned's obligations and liabilities to * * * [Lionel] in total exceed the Maximum Liability.

\* \* \* \* \* \* \*

5. Anything to the contrary herein notwithstanding, this Agreement is executed by the undersigned on the express condition that * * * [Lionel] and the Partnership, by their respective acknowledgments hereof, represent, warrant and agree that the * * * [Hart note] shall provide that the

liability of the undersigned in respect of said Debt as set forth in this Agreement shall automatically terminate and be no longer of any force or effect at such time as the Partnership has made $2,870,000 in total payments (principal and/or interest) on the * * * [Hart note] out of rentals on the Film.[7] It is understood that $300,000 of interest being paid on the * * * [Hart note] from the sale of Interest in the Partnership is not included in such $2,870,000 of payments.

All of the limited partners of Hart executed assumption agreements identical to the one executed by Dr. Tolwinsky with the exception of the amount of each limited partner's "maximum liability" thereunder. In almost every instance, a limited partner's "maximum liability" was equal to 250 percent of the amount of cash that such partner contributed to the partnership. Mr. Pearl and RGF did not use assumption agreements in the motion picture production partnerships that they formed prior to the enactment of the "at risk" rules in the Tax Reform Act of 1976. When, as TBC Films, they first began forming negative pickup partnerships, they did not require that the limited partners execute assumption agreements, but by 1978, they decided to require that all limited partners execute such agreements because offering a choice was, in Mr. Pearl's words, "such a pain in the neck." Katten, Muchin prepared an informational memorandum that was provided to prospective investors in Hart and which explained the purpose of the assumption agreements as follows:

### "AT RISK" RULES

By virtue of the Tax Reform Act of 1976, a non-corporate investor (which term includes an investor which is a personal holding company or a Sub-Chapter S corporation) in a partnership engaged in the motion picture business can recognize losses only to the extent of his investment "at risk" (i.e., the amount of his actual net cash investment in the Partnership, plus the portion of any Partnership liabilities for which such limited partner is personally liable). To the extent the non-corporate investor's share of Partnership losses exceeds his investment "at risk", the excess losses are deferred and may, under certain circumstances, be used to offset future income from the Partnership.

Each investor is required to become personally liable for a proportionate share of the Partnership's liability on the $7,175,000 Purchase Price

---

[7]According to the Lionel-Hart acquisition agreement and the Hart note, as finally executed, the partners' liability under the assumption agreements was to terminate upon the payment of $4,750,000 (principal and/or interest). See text at pages 1023-1024. The discrepancy between the assumption agreements and the acquisition agreement and the note is unexplained.

Note. Those investors who wish to currently recognize substantially all of their share of the potential Partnership losses in 1978, 1979 and 1980 must be "at risk" in an amount equal to their cash invested in the Partnership, plus liabilities equal to approximately 250% of their cash investment in the Partnership. * * *

*The requirement that an investor become personally liable for a share of the Purchase Price Note materially increases an investor's investment risk.* His maximum loss will not be limited to his cash investment in the Partnership, as is typically the case in limited partnership investments. However, in order to provide some additional protection to investors, the major portion of the "gross receipts" generated by the Film will be applied against the Purchase Price Note until such time as payments totalling $2,870,000[8] have been made thereon and such Note has become non-recourse. See "DISTRIBUTION ARRANGEMENT" above. Based on its estimate of the gross recipts [sic] which it believes the Film should generate, the General Partner believes that the portion of the "gross recipts" [sic] which will be available for application on the Purchase Price Note will be sufficient to provide for the necessary $2,870,000 of payments on the Note by some time in 1981. *However, neither the Distributor, the subdistributor, the General Partner, the Seller, nor any other party will guarantee that the Partnership will receive sufficient funds to pay down the Purchase Price Note to the point where it becomes non-recourse. To the extent of the liability assumed, the investor will have the full economic risk of loss.*

See Paragraph 3 under "RISK AND OTHER IMPORTANT FACTORS" and Paragraphs 4 and 18 under "TAX ASPECTS" generally.

The foregoing "at risk" rules do not apply to limited partners which are corporations (other than personal holding companies and Sub-Chapter S corporations). Accordingly, such a corporate limited partner which does not go "at risk" would be entitled to recognize its full share of Partnership operating losses. (However, see Paragraph 18(b) under "TAX ASPECTS"). Due to complex tax rules relating to basis (See "TAX ASPECTS—Tax Basis of Limited Partnership Interest"), the General Partner may agree to form and permit non-recourse corporate investors to become partners in a separate general partnership which will acquire an undivided interest in the Film. If and to the extent any corporate investors elect not to go "at risk" they will be provided with supplemental information in this regard. The formation of such a separate general partnership will require certain revisions in the agreements relating to the acquisition and distribution of the Film, but will in no manner affect the economic or tax results to other investors, as described herein. The General Partner also reserves the right not to offer this alternative to corporate investors.

[Emphasis in original.]

According to the informational memorandum, Hart was to pay TBC Films an "acquisition fee" of up to $300,000

---

[8]See note 7 *supra.*

from the proceeds of the offering "for services in selecting and acquiring the Film." To the extent that any sales commissions were payable in connection with the sale of partnership interests, they were to be paid by the partnership and would reduce the amount of such "acquisition fee." Balcor might receive such commissions if, as occurred, it syndicated partnership interests. TBC Films was also entitled from the proceeds of the offering to an "organization fee" of $15,000, a "syndication fee" of $20,000, and a "management fee" of $40,000 (payable $20,000 in 1978 and $20,000 in 1979). Furthermore, TBC Films was entitled to a 1-percent share of the cash distributions of Hart, and when the limited partners as a group received cash distributions equal to their total cash investment in Hart, TBC Films was entitled to an additional 19 percent of any additional cash distributions as an "incentive management fee."

TBC Films paid Katten, Muchin a total of $9,806 in 1979 for services rendered by the law firm in 1978 in connection with Hart. Such fee included charges of $7,925 for "income tax work, drafting documents, Distribution Agreement, Purchase Agreement, conferences and all matters relating thereto," $1,579 for expenses incurred by Mr. Pearl and his partner, G.M. Penner, in traveling to New York and Los Angeles, and $302 for telephone, courier, and photocopying expenses.

Universal first released "The Deer Hunter" in December 1978 in Los Angeles and New York. The film had no prior release in any territory. It went into wider release in February or March of 1979.

Directed by Michael Cimino and produced by Barry Spikings, John Peverall, Michael Cimino, and Mr. Deeley, "The Deer Hunter" starred Robert DeNiro, Meryl Streep, John Cazale, John Savage, and Christopher Walken. The motion picture won five Academy Awards at the 51st (1978) Annual Academy Awards function held in April 1979: best picture, best supporting actor (Christopher Walken), best director (Michael Cimino), best film editing, and best sound.

Through July 2, 1983, Universal reported receipt of the following amounts of accountable gross and net profits (as defined in the production-financing-distribution agreement), and British Lion (as assignee of EMI's rights under such

agreement) was entitled to the listed amounts as its share of the net profits:

| Accounting through | Total accountable gross to date | Total net profits to date | Total net profits due British Lion to date |
|---|---|---|---|
| 6/30/79 | $19,234,640.97 | $922,607.18 | $461,303.59 |
| 6/28/80 | 29,511,056.73 | 5,709,652.93 | 2,854,826.47 |
| 7/ 4/81 | 32,453,346.16 | 7,009,031.47 | 3,504,515.74 |
| 4/ 3/82 | 33,358,915.90 | 7,440,435.47 | 3,720,217.74 |
| 7/ 2/83 | 34,782,470.82 | 8,086,327.92 | 4,043,163.96 |

Based on Universal's periodic reports of accountable gross, EMI issued British Lion checks to Hart in payment of amounts due Hart under level I:

| Year | Level I payments | Accounting through |
|---|---|---|
| 1979 | $1,549,078 | 6/30/79 |
| 1980 | 418,364 | 6/28/80 |
| 1981 | 127,692 | 7/04/81 |
| 1982 | 36,223 | 4/03/82 |
| 1983 | 56,942 | 7/02/83 |

Hart distributed most of the level I payments to its partners. Through 1983, the petitioner received the following distributions from Hart:

| Year | Amount |
|---|---|
| 1979 | $43,470 |
| 1980 | 8,211 |
| 1981 | 4,152 |
| 1982 | 644 |
| 1983 | 0 |

Through December 23, 1983, Hart issued checks totaling $81,932 to Mr. Takiff with respect to Lionel's reservation of the right to television syndication revenues under the Lionel-Hart acquisition agreement.

In 1979, Hart was entitled to a level II payment of $560,000, thereby obligating Hart to make an interest payment of an equal amount under the Hart note. However, British Lion and Hart failed to make their respective payments. After the Commissioner began examining Hart's partnership returns, Mr. Pearl asked EMI to have Great Lakes telex the following message to Mr. Pearl:

This is to confirm that the 1979 interest payment of dollars 560,000 due from Hart to Great Lakes Holding Establishment was not paid and that amount was capitalized into the principal amount.

Great Lakes telexed such message to Mr. Pearl on February 12, 1981. Meanwhile, in 1980, Bank of America closed the Hart and Great Lakes blocked accounts due to an absence of activity. Thereafter, EMI opened new blocked accounts at Bank of America.

On August 4, 1980, Mr. Pearl sent a letter reminding EMI that "our distributor, British Lion Films, is not only required to make the payments as indicated in your statements [level I], but should be accruing interest and principal payments for the pay-down on the purchase price Note whereby the films ["The Deer Hunter" and "Death on the Nile"] were purchased from Great Lakes Holding Est." Thereafter, in each December, starting in 1980, EMI authorized the issuance of a check from British Lion's bank account, payable to Hart, for the amount due under level II. Each check was deposited to Hart's blocked account, and then the funds were immediately transferred through Great Lakes' account and back to EMI's account. Once a deposit was made to Hart's account, the funds returned to EMI in approximately 35 seconds. The level II payments and their allocation by EMI[9] between the principal and interest due under the Hart and Lionel notes were as follows:

|  |  | Allocation | |
| --- | --- | --- | --- |
| Date | Level II payment | Principal | Interest |
| Dec. 1980 | $1,395,750 | $750,000 | $645,750 |
| Dec. 1981 | 1,370,550 | 750,000 | 620,550 |
| Dec. 1982 | 1,311,115 | 750,000 | 561,115 |
| Dec. 1983 | 1,733,900 | 1,231,250 | 502,650 |

Were it not for the holdback schedule of level II, the Hart and Lionel notes would have been repaid in full in 1979. Hart included the level II payments in income on its returns for 1980 through 1983.

Hart has received no payments under level III, and it is highly unlikely that it ever will. A supplement to the informational memorandum provided to potential investors cautioned investors to assume that only level I payments would be available for distribution to Hart's partners.

Hart's Federal partnership returns were filed on a calendar year basis and were prepared by use of the cash method

---

[9] On its partnership returns, Hart claimed deductions for interest payments on the Hart note that varied in amount from the interest allocations made by EMI. The discrepancies are unexplained.

of accounting. The table on page 1036 is a summary of the income and expenses reported on the partnership's returns for 1978 through 1983.

Hart claimed a depreciable cost basis in the motion picture of $8,384,562 in 1978 and $8,345,600 in 1979 through 1981. The cost basis in 1978 was calculated by adding the purchase price of the motion picture ($8,110,000) to the amount of the "acquisition fee" due TBC Films ($300,000 less $25,438 of commissions paid in connection with the sale of partnership interests). The cost basis was reduced by $38,962 in 1979, to account for the payment of an additional $38,962 of sales commissions because such commissions reduced the acquisition fee due TBC Films. In 1978, Hart used the 175-percent declining balance method of depreciation over a 3-year useful life. In 1979 through 1981, Hart employed the straight line method, a 3-year useful life, and no salvage value. The claimed interest deductions of $214,250 in 1978 and $85,750 in 1979 were based on Hart's payment in 1978 of $300,000 as prepaid interest on the Hart note. The claimed deductions for organization costs resulted from the amortization under the straight line method over a 5-year period of a $15,000 "organization fee" paid to TBC Films in 1978. The claimed deductions for guaranteed payments to partners were for "management fees" of $20,000 paid to TBC Films in 1978 and 1979. On its 1978 return, Hart also reported an investment of $1,209,532 in property qualified for an investment tax credit.

During 1978 and 1979, the petitioner had an interest of 2.828571 percent in Hart's profits and losses. On his Federal income tax returns, Dr. Tolwinsky claimed losses of $43,041 in 1978 and $31,952 in 1979 as his distributive shares of Hart's partnership losses for such years. He also claimed an investment tax credit with respect to the motion picture in 1978. In his notices of deficiency, and by amendment of his answers, the Commissioner has disallowed all of Hart's claimed deductions in 1978 and 1979 and Hart's claimed investment in qualified property. The Commissioner therefore disallowed the entire amounts of the petitioner's reported loss and credit in 1978, and he further determined that the petitioner had income of $44,081 from Hart in 1979.

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|
| Gross receipts | - - - | $1,549,078 | $1,814,114 | $1,488,242 | $1,347,338 | $1,790,842 |
| Interest | - - - | 9,317 | 2,744 | 2,674 | 2,604 | 15 |
| Total income | - - - | 1,558,395 | 1,816,858 | 1,490,916 | 1,349,942 | 1,790,857 |
| Expenses | | | | | | |
| Depreciation | $1,286,399 | 2,579,187 | 2,579,187 | 1,900,827 | - - - | - - - |
| Interest | 214,250 | 85,750 | 635,135 | 620,550 | 561,145 | 909,423 |
| Guaranteed payments to partners | 20,000 | 20,000 | - - - | - - - | - - - | - - - |
| Amortization of organization fee | 1,000 | 3,000 | 3,000 | 3,000 | 3,000 | 2,000 |
| Incentive management fee | - - - | - - - | 47,223 | 34,509 | 5,353 | - - - |
| Legal fee | - - - | - - - | - - - | - - - | 14,700 | 2,000 |
| Television syndication rights fee | - - - | - - - | - - - | - - - | 33,198 | 48,734 |
| State replacement tax | - - - | - - - | - - - | - - - | - - - | 9,931 |
| Filing fee | - - - | - - - | - - - | - - - | - - - | 1 |
| Miscellaneous | 6 | 82 | 21 | - - - | - - - | - - - |
| Total expenses | 1,521,655 | 2,688,019 | 3,264,566 | 2,558,886 | 617,396 | 972,089 |
| Ordinary income (loss) | (41,521,655) | (1,129,624) | (1,447,708) | (1,067,970) | 732,546 | 818,768 |

OPINION

The first issue for decision is whether Hart acquired a depreciable interest in the motion picture "The Deer Hunter." However, before we determine the nature of the interest acquired by Hart, we must examine the role of several parties in the transactions involved here. Despite the multiplicity of players, we conclude that the real parties in interest were EMI and Hart and, to some extent, Universal. British Lion was interchangeable with EMI: both companies were wholly owned by EMI LTD.; their funds were commingled in a common bank account; they filed consolidated tax returns; and EMI authorized the issuance of British Lion checks for amounts due under the British Lion distribution agreement. Great Lakes and Lionel were mere "pass-through" or "strawman" entities, inserted in the chain of title between EMI and Hart at Mr. Pearl's behest and for obvious tax planning purposes.

Where transactions serve no "purpose, substance, or utility apart from their anticipated tax consequences," they are disregarded for tax purposes. *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see also *Knetsch v. United States*, 364 U.S. 361 (1960). The petitioner does not suggest any business purpose that may have been served by the interjection of Great Lakes but contends that "the entire Great Lakes matter was injected into this case by respondent for the purpose of throwing a smokescreen around the acquisition of the film by Hart. The entire Great Lakes affair is totally irrelevant to any issue as it merely involved internal matters of EMI." We disagree. If anyone has tried to throw a "smokescreen" around Hart's acquisition of the film through the insertion of Great Lakes in these transactions, it was Mr. Pearl. During their negotiations, Mr. Pearl informed Mr. Strauss that Mr. Pearl's investors did not wish to purchase the film from the party (EMI/British Lion) that would also be distributing it under the simultaneously negotiated distribution agreement. Although he did not tell Mr. Strauss why the seller and the distributor were not to be the same, it is reasonable to infer that Mr. Pearl was seeking to avoid the appearance of a two-party sale-leaseback transaction. Great Lakes was a mere phantom; neither Mr. Pearl, Mr. Strauss,

Mr. Deeley, nor any of the other participants in these transactions admitted knowing who owned Great Lakes, and no one independently represented it in negotiating the price or the terms of the acquisition or sale of the motion picture. There was no explanation of the reason for paying Great Lakes $325,000, but such payment may have been merely the reward to someone for his role in arranging these transactions.

The record also establishes that the insertion of Lionel in these transactions served no business purpose. The petitioner contends, and Mr. Pearl and Mr. Reinsdorf testified, that Lionel's role in this and in other TBC Films' motion picture ventures was necessitated by the reluctance of movie companies to do business directly with partnerships:

> Since under normal circumstances several months transpire between the time the negotiations for the purchase of the film begin and the time the partnership is syndicated and funded, the movie companies are exposed to the risk that unformed partnerships would not be able to raise sufficient capital in the interim thereby causing the film companies to lose opportunities to sell their films or otherwise exploit them.

The petitioner's explanation is unpersuasive for a number of reasons. First, Mr. Strauss, Mr. Deeley, and Mr. Boose testified that they were not concerned that EMI deal with Lionel rather than Hart, and none of those gentlemen recalled anyone at EMI expressing such a concern. Second, although Mr. Pearl began negotiating with EMI sometime in May 1978, before Hart was formed, the contracts between EMI, Great Lakes, and Lionel were not executed until September 26, 1978, after Hart was syndicated and only 2 days before Hart paid Lionel the $550,000 due under the Lionel-Hart acquisition agreement. Such arrangement was typical of TBC Films' motion picture deals: generally, there was a period between the negotiation of a movie deal and the funding of the limited partnership, but, except on two occasions, the sale to Lionel was not closed until the partnership's funds were available to reimburse Lionel. Mr. Pearl acknowledged at trial that Lionel's purported ability to fund a purchase was not actually needed in 1978 and in later years because "we had the program so well oiled." In fact, Balcor has never been unable to fund a partnership that it has syndicated. Finally, it strains credulity to

suggest that movie companies relied on the financial resources of Lionel rather than on the marketing prowess of Mr. Pearl and the Balcor organization. In 1978, Lionel had assets of only $18,945 and no credit lines. Lionel's owner, Mr. Takiff, may have possessed considerable financial resources, but there is no evidence that he personally guaranteed Lionel's obligations.

It is true that Lionel received a fee for its role and that it sometimes retained the right to revenues from television syndications. Nevertheless, such rewards to Lionel do not alter the nature of its role; they do not establish a business purpose for the activities of Lionel.

The only purpose served by the interposition of Lionel between EMI and Hart was to create the appearance of "risk" to Hart's partners for purposes of the "at risk" provisions of section 465 of the Internal Revenue Code of 1954.[10] Lionel "purchased" "The Deer Hunter" for cash and a nonrecourse note, yet "resold" the motion picture to Hart for cash and a nonrecourse note backed by assumption agreements under which Hart's limited partners assumed personal liability for a portion of Hart's note. Lionel did not need the assumption agreements to protect its financial interests. Under the Lionel-Hart acquisition agreement, Lionel was entitled to any receipts under the British Lion distribution agreement that were based on Universal's accountable gross from television syndication. Through December 1983, Hart paid Mr. Takiff $81,932 of the level I receipts in accordance with their agreement. Since British Lion (EMI) had no right to recover the level I payments in the event that Lionel defaulted on its note (which was not even due until December 31, 1986), Lionel's interest in the level I payments attributable to television syndication receipts was not endangered if Hart defaulted on its note.

More importantly, we are convinced that Lionel never intended to enforce the assumption agreements if they became effective. It is significant that the Lionel-Hart acquisition agreement and the Hart note did not specify the amount of personal liability assumed by the partners; an amount, usually equal to 250 percent of each partner's cash

[10] All statutory references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.

investment, was merely inserted in each assumption agreement at the time of the partner's subscription. It is also significant that the acquisition agreement and note stated that the partners' personal liability would terminate on payment of $4,750,000 of principal and interest, whereas the assumption agreements specified that personal liability terminated on payment of only $2,870,000. These facts strongly suggest that the partners' assumption of personal liability was not taken seriously by Lionel. Moreover, the informational memorandum provided to prospective Hart investors emphasized that the execution of assumption agreements was necessary if the partners were to be able to recognize all of Hart's expected tax losses; corporate investors, who were exempt from the "at risk" rules, might be allowed to forego the execution of an assumption agreement at the option of Hart's general partner, TBC Films. Mr. Pearl testified that, by 1978, all investors, including corporations, were required to execute assumption agreements because allowing investors the option of being or not being "at risk" was a "pain in the neck." Such statements reveal that Lionel did not demand the execution of assumption agreements, and despite Mr. Takiff's protestations to the contrary, we are convinced that Lionel would never have enforced such agreements. At trial, Mr. Takiff could not remember the terms of the agreements or whether they were currently enforceable. Mr. Takiff was a friend and former law school classmate of both Mr. Pearl and Mr. Reinsdorf, and it is obvious that they invited him to participate, through Lionel, in TBC Films' motion picture ventures in order to allow the investors to be "at risk" for tax purposes without being at any genuine risk of loss. We therefore conclude that the assumption agreements did not represent bona fide obligations and that they and Lionel must be disregarded for purposes of determining the true nature of the interest acquired by Hart and the tax liabilities of its partners. As the Supreme Court explained in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945), "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

We turn now to the issue of the nature of the interest acquired by Hart. It is axiomatic that the economic substance of a transaction rather than the form in which it is cast is determinative of its tax consequences. See *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and the cases cited therein. Thus, in a number of cases, courts have refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred. E.g., *Helvering v. Clifford*, 309 U.S. 331 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252 (1939); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); *Miller v. Commissioner*, 68 T.C. 767 (1977). "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). It is therefore fundamental that the availability of a depreciation deduction is not predicated upon the ownership of property but rather upon a capital investment in the property. *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. 336 (1925).

In the case before us, EMI purportedly sold to Hart the motion picture negative and all copyrights thereto, excepting all remake, sequel, and television production rights and subject to the rights granted Universal under the production-financing-distribution agreement. Concurrently, under the British Lion distribution agreement, British Lion (EMI) was granted certain rights with respect to the motion picture. Whether Hart became the owner of the motion picture for tax purposes as a result of such transactions is a question of fact to be determined by reference to the written agreements read in light of the attending facts and circumstances. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981); *Miller v. Commissioner*, 68 T.C. at 776; see *Fields v. Commissioner*, 14 T.C. 1202, 1210-1213 (1950), affd. 189 F.2d 950 (2d Cir. 1951).

Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. sec. 202 (1982) (effective Jan. 1, 1978); *Michael Todd Co. v. Los*

*Angeles County*, 57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the former without possession of at least certain of the rights encompassed by the latter is commercially valueless. See *Misbourne Pictures Ltd. v. Johnson*, 189 F.2d 774, 776 (2d Cir. 1951). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." *Goldsmith v. Commissioner*, 143 F.2d 466, 467 (2d Cir. 1944) (L. Hand, J., concurring), affg. on other grounds 1 T.C. 711 (1943). The exclusive rights that comprise the so-called "bundle of rights" that is a copyright in a motion picture are detailed in 17 U.S.C. sec. 106 (1982):

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of * * * motion pictures and other audiovisual works, to perform[11] the copyrighted work publicly; and

(5) in the case of * * * the individual images of a motion picture or other audiovisual work, to display[12] the copyrighted work publicly.

Each of the five rights comprising the copyright may be subdivided indefinitely, and under copyright law, each subdivision of an exclusive right may be owned and enforced separately. 17 U.S.C. sec. 201(d) (1982).

For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. 642 (1973) (Court-reviewed); see *Fields v. Commissioner*, *supra* (sale of motion picture rights to play); *TeLinde v. Commissioner*, 18 T.C. 91 (1952) (book); cf. *Consolidated Foods Corp. v. United States*, 569 F.2d 436, 437 (7th Cir. 1978) (trademark); *Green v. Commissioner*, 83 T.C. 667 (1984) (patent); *Bell Intercontinental Corp. v. United States*, 180 Ct. Cl. 1071, 1077, 381 F.2d 1004, 1010

---

[11]The definition of "perform" in relation to a motion picture is "to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. sec. 101 (1982).

[12]The definition of "display" in relation to a motion picture is "to show individual images nonsequentially."

(1967) (patent). No sale occurs if the transferor retains proprietary rights in the motion picture. See *Carnegie Productions, Inc. v. Commissioner, supra* at 653; *Cory v. Commissioner*, 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). The Commissioner, who bears the burden of proof on this issue, having raised it by amendment of his answers, contends that Hart acquired, at most, bare legal title to an "undivided interest in the original camera negative" and the copyrights in the United States and Canada and a profits "participation" of some kind, based on the accountable gross reported by Universal. The Commissioner argues that EMI had previously sold to Universal all substantial rights to the motion picture, in perpetuity, under the production-financing-distribution agreement, and therefore, EMI had no valuable or substantial rights in the motion picture to sell when it entered into the EMI-Great Lakes acquisition agreement. In addition, the Commissioner maintains that whatever rights EMI may have had to sell to Hart were immediately resold to British Lion (EMI) under the British Lion distribution agreement. The petitioner, on the other hand, asserts that the sale of "The Deer Hunter" to Hart came about as a result of an arm's-length transaction between unrelated parties and that, as a result of their "real and substantial negotiations," Hart became the owner of, and invested $8,110,000 in, the motion picture. After a thorough review of the record, we are convinced that Hart did not acquire a depreciable interest in the motion picture but, in substance, purchased a contractual right to payments contingent upon the success of the motion picture.

That the EMI-Great Lakes, Great Lakes-Lionel, and Lionel-Hart acquisition agreements used the language of a sale and purported to convey ownership of the motion picture is not determinative of whether Hart actually became the owner for purposes of depreciation. *Helvering v. F. & R. Lazarus Co., supra*; *Green v. Commissioner, supra*. Similarly indecisive is the fact that Hart acquired legal title to the motion picture copyright. *Carnegie Productions, Inc. v. Commissioner, supra*; *Fields v. Commissioner, supra*. "Legal title alone, without beneficial ownership, and held for the interest of another, is without value." *Parke, Davis & Co. v. Commissioner*, 31 B.T.A. 427, 431 (1934).

An examination of the various written agreements reveals that Hart acquired no substantial rights in the motion picture. We need not decide whether, as the Commissioner contends, the production-financing-distribution agreement effected a sale of the motion picture to Universal; the cumulative effect of the production-financing-distribution agreement, the assignment of such agreement, and the British Lion distribution agreement was to ensure that between them, Universal and EMI retained all substantial rights of value in the motion picture in perpetuity.[13] Under the production-financing-distribution agreement, Universal obtained the most obviously valuable copyright associated with a motion picture—the exclusive and perpetual right to distribute "The Deer Hunter" in all media throughout the United States and Canada.[14] In connection therewith, EMI granted Universal the unlimited right to make positive prints from the negative. The production-financing-distribution agreement gave EMI a net profits interest in the proceeds of Universal's distribution efforts, but EMI did not convey such interest to Hart; instead, with Universal's permission, EMI assigned all of its rights under the production-financing-distribution agreement to British Lion immediately before EMI entered into the EMI-Great Lakes acquisition agreement.

Any rights that EMI may have conveyed to Hart (through Great Lakes and Lionel) either were simultaneously granted back to EMI by virtue of the British Lion distribution agreement or were of no apparent commercial value. Under its agreement with Universal, EMI expressly retained certain rights: the right to publish the music and literary material contained within the motion picture; the right to issue commercial phonograph records or tapes of the soundtrack; and the derivative rights to the motion picture and its underlying literary material (i.e., the right to use or license the use of remake, sequel, special, or television series rights). EMI also possessed the right to make copies of the

---

[13]Because we find that Hart acquired *no* substantial rights in the motion picture, we also need not decide whether a taxpayer may have an ownership interest in only a part of a film for depreciation purposes: for example, where the taxpayer purchases the exclusive and perpetual right to display a motion picture on free television. Cf. sec. 1.48-8(a)(2), (4)(v) Ex. 4, Income Tax Regs. (investment credit for motion pictures). Of course, even if no sale has occurred, a llicense may be a depreciable asset. *Kiro, Inc. v. Commissioner*, 51 T.C. 155 (1968).

[14]The parties agree that copyrights to a motion picture may be sold on a territorial basis.

motion picture, although it could not distribute such copies. EMI purported to convey to Hart, subject to the rights of Universal, all of EMI's right, title, and interest in the motion picture "and the literary, dramatic and musical material which is contained therein, including an undivided interest in the original camera negative * * * and any and all copyrights and rights to obtain copyrights and renewals and extensions of copyright" in the United States and Canada, excepting all derivative rights to the motion picture, which EMI expressly retained. Simultaneously with the conveyance of such rights, by means of the British Lion distribution agreement, EMI was granted back "the sole and exclusive right to distribute, exhibit, rent, advertise, license, make outright or flat sales, exploit, transmit, perform, release, reissue, rerun, subdistribute, sublicense and otherwise market" the "Picture * * * by any and all means and media" throughout the United States and Canada. It is not clear whether or not such distribution agreement was intended to grant the rights with respect to the musical and literary material contained in the motion picture; the agreement ambiguously refers to "the Picture." Similar language was used in the production-financing-distribution agreement, but that agreement went on to expressly exclude musical and publishing rights. In any event, whether such rights were granted to EMI or retained by Hart, there is no evidence that they were of value or ever exploited in any way. Hart's private offering memorandum made no mention of such rights, focusing instead on Universal's distribution of the film.

Furthermore, the term of the British Lion distribution agreement was 15 years, but as a practical matter, the grant of the rights therein was perpetual.[15] By its express terms, the agreement was automatically renewed in perpetuity unless Hart gave British Lion (EMI) notice of its intention to terminate the agreement within 60 days prior to the termination of the 15-year period, and even if Hart gave such notice, British Lion (EMI) could renew the

---

[15]We express no opinion as to whether a grant for a fixed term (i.e., less than perpetual or the duration of the copyright) might convey ownership for depreciation purposes; but we observe that a grant for "the entire period of substantial exploitation of the film" may convey an "ownership interest" for purposes of the investment tax credit. Sec. 1.48-8(a)(2), (4), Income Tax Regs.

agreement in perpetuity by paying no more than $7,500. Because Universal possessed the exclusive right to exploit the motion picture film in perpetuity, Hart would have, at most, only the musical and publishing rights, which were of no apparent value, to license in the event that it terminated the agreement. It is therefore inconceivable that Hart would elect to terminate the agreement as it is only under such agreement that it could receive any money. Moreover, if the rights granted under such agreement were of value at the end of the 15-year term, British Lion (EMI) could pay the minimal sum required (which sum was recoupable out of any amounts thereafter due Hart under the agreement) and retain such rights in perpetuity.

Our conclusion that EMI did not convey all substantial rights in the motion picture is further supported by the fact that EMI retained a significant financial stake in the motion picture. After receiving Universal's production advance of $4,220,000 and Hart's cash payments of $1,225,000 (including $300,000 denominated as "prepaid interest" under the Great Lakes-Lionel and Lionel-Hart acquisition agreements but not under the EMI-Great Lakes acquisition agreement), EMI remained at financial risk for about $6,500,000 that it had invested in the motion picture. Furthermore, EMI possessed a 50-percent interest in the net profits of Universal's distribution, but EMI did not convey such interest to Hart when it purported to sell Hart all of its interest in the motion picture. Instead, under the British Lion distribution agreement, EMI agreed to pay Hart certain amounts based on Universal's reported "accountable gross" regardless of the amount (if any) that EMI actually received from Universal. Thus, while the amount that EMI would owe Hart ultimately depended on the success or failure of Universal's distribution, such amount was not tied to EMI's interest in the receipts generated by such distribution. By severing the rights to the motion picture's income from the legal title to the motion picture, EMI retained an interest in the proceeds of its exploitation. If, as actually occurred, the motion picture was successful, EMI's share of the proceeds of its exploitation would exceed the amounts that it owed

Hart under level I of the British Lion distribution agreement.[16]

As explained by the Supreme Court in *Helvering v. F. & R. Lazarus Co.*, 308 U.S. at 254, a deduction for exhaustion, wear, and tear is granted to a person who uses property in his trade or business and incurs a "loss resulting from depreciation of capital he has invested." In the seminal case of *Gladding Dry Goods Co. v. Commissioner, supra*, the lessee of a store paid for improvements to the property in return for an extension of the lease. The Board of Tax Appeals held that the lessee was entitled to depreciate the cost of such improvements over the lease term as extended. The Board explained that depreciation "is not predicated upon ownership of the property, but rather upon an investment in property which is thereafter used. * * * The material elements are, the person who makes the investment, use of the property, and the period over which that investment is to be recovered out of income." 2 B.T.A. at 338-339. Here, Hart purported to buy "The Deer Hunter" from EMI, but Hart acquired no control over the picture's exploitation or "use," and it did not assume EMI's financial position with respect to the picture, that is, the right to the stream of income arising from the "use" of the picture against which an investment in the picture would be recovered. Instead, Hart purchased a right to receive certain payments, the amounts of which were measured by the accountable gross resulting from the distribution of "The Deer Hunter." The amounts of those payments were not dependent upon the income received by EMI or Universal from such distribution; if the accountable gross reached the prescribed level, Hart was entitled to its payments even though the distribution of "The Deer Hunter" resulted in no income because the expenses exceeded the accountable gross.

Our conclusion that Hart acquired, for tax purposes, a right to contingent payments rather than ownership of the motion picture is also supported by the fact that Hart's actual investment was far less than the alleged fair market value of EMI's interest in the motion picture. "[A] normal

---

[16]See discussion of the illusory nature of the level II payments and the Lionel and Hart notes and the unlikelihood of the level III payments at pages 1048-1050 of this opinion.

attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value." *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. at 1240-1241. For purposes of our discussion, we may assume that the total "purchase price" payable to EMI (through Lionel and Great Lakes) of $8,100,000 was approximately equivalent to the fair market value of EMI's interest in the U.S. and Canadian rights to the motion picture, including its 50-percent net profits interest.

Hart paid EMI a total of $1,225,000 in cash (including $300,000 which Hart deducted as "prepaid interest" but which, significantly, was not labeled as "interest" in the EMI-Great Lakes acquisition agreement) and executed a $7,175,000 nonrecourse note.[17] A nonrecourse note may reflect a bona fide liability, but in the present case, Hart's note and the level II payments with which it was retired were mere paper transactions, wholly lacking in economic substance. The principal and interest payments on the note were payable only out of the level II payments made by British Lion (EMI) under the British Lion distribution agreement. Like the level I payments, the level II payments were computed on the basis of Universal's accountable gross; they were not payable out of the proceeds of the motion picture's distribution. EMI routed the level II payments, which were exactly equal to the amounts due under the note, through the blocked bank accounts and back to itself in a matter of seconds. Ms. Jackson, the corporate secretary of EMI and British Lion, referred to the level II payments as "round robin" payments because they traveled around the bank accounts and back to EMI in a way that "the money couldn't drop out." The illusory nature of the level II payments, which British Lion (EMI) was purportedly paying as a "license fee" for the right to distribute the picture, is demonstrated by comparing their amount with the amounts actually received by EMI from the distribution of the picture: by June 30, 1979, Universal had accountable gross of approximately $19,000,000; if Universal earned no more accountable gross after that point,

---

[17]We treat the Lionel and Hart notes as interchangeable. The Hart note was backed by the assumption agreements executed by Hart's partners, but such agreements were not enforceable by EMI, and moreover, as explained in the text at pages 1039-1040, such assumption agreements did not represent a genuine assumption of liability by the partners.

British Lion (EMI) would have been liable for a level II payment of $7,175,000, plus interest, even though it was entitled to only $461,303.59 as its share of Universal's net profits ($4,681,303.59 if Universal's contribution towards EMI's production costs is included). By the end of 1983, British Lion (EMI) was liable for level II and interest payments exceeding $9,500,000 even though its share of net profits amounted to only $4,043,163.96 ($8,463,163.96 if the production advance is included). However, from EMI's point of view, the size of the note and of the corresponding level II payments was irrelevant, except insofar as it was a part of the formula for determining British Lion's (EMI's) liability under level III, because British Lion (EMI) was never out-of-pocket for the level II payments and its financial risk was not reduced by the retirement of the note.

For its part, Hart was not financially affected by the retirement of the note. Only the level I payments were available for distribution to Hart's partners, and such payments depended on Universal's achieving certain levels of accountable gross, not on the retirement of the note.[18] No benefit, either through current payments or through the buildup of equity valuable in the future, accrued to Hart as a result of the retirement of the note. See *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Of course, the note was secured by the acquisition agreements and the British Lion distribution agreement, and EMI could foreclose on such security after December 31, 1986, in the event that the note was not paid off. However, the foreclosure would have little, if any, negative economic effect on Hart because the motion picture would then be well beyond its 3-year economic useful life (as claimed by Hart in calculating its depreciation deductions).

The illusory nature of their respective obligations under level II and the note is further illustrated by the conduct of EMI and Hart subsequent to assuming such obligations. In

[18] The level III payments were payable "after the Deer Hunter Note is paid in full," but such condition was, in effect, a shorthand way of referring to the level of accountable gross (approximately $19 million) required to retire the note. Even then, the level III payments were were not payable until EMI had "net profits" as defined in the British Lion distribution agreement, which would not occur until Universal had accountable gross greatly in excess of $19 million. Level III payments were not and are not anticipated by Hart and EMI.

1979, EMI failed to route the level II payment due through the blocked accounts in payment of the note, and Hart failed to report the level II payment as income on its 1979 return. The parties' lapse apparently went unnoticed until the Commissioner began an examination of Hart's partnership returns. At that point, Mr. Pearl, in an obvious attempt to create a paper trail giving an appearance of economic substance to such payments, had Great Lakes telex him a message stating that the missed note payments had been capitalized into the principal amount of the note. Mr. Pearl likewise had to send EMI a letter reminding it of British Lion's obligation to make the level II payments so that Hart could make payments to EMI on the note. Since only Hart's anticipated tax benefits depended on the parties' "going through the motions" with respect to level II and the note, it is understandable that EMI would forget to participate in the charade.

In short, a careful examination of the economic substance of the transactions between Hart and EMI reveals that, although in form Hart paid EMI a total of $8,100,000 for the motion picture, in reality, Hart paid EMI a total of $1,225,000 for the right to the level I payments and, if the motion picture was wildly successful, the level III payments. Such income interest was akin to, but was not in fact, a "participation" in the profits of the motion picture's exploitation. The sole "purpose, substance, or utility" of EMI's conveyance of legal title to the motion picture to Hart was to obtain an anticipated shifting of tax benefits to Hart, with such benefits artificially enhanced by the use of illusory debt. See *Goldstein v. Commissioner, supra.* As stated in *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613 (1938), "A given result at the end of a straight path is not made a different result because reached by following a devious path."

The petitioner relies heavily on our recent decision in *Estate of Thomas v. Commissioner,* 84 T.C. 412 (1985), as support for his contention that Hart was the owner of "The Deer Hunter" for tax purposes, but the facts of that case were significantly different. There, the taxpayer was a member of a limited partnership that purchased new computer equipment from IBM and then leased such

equipment to four major corporations. The partnership paid fair market value for the equipment, paying with cash contributed to the partnership and borrowed from independent banks and a financing corporation. The nonrecourse debt was secured by the equipment and an assignment of the equipment leases. The parties stipulated that the monthly lease payments, which were slightly larger than the monthly payments due on the nonrecourse loans, were negotiated at arm's length and were less than those available under third-party operating leases or leases made directly with IBM. The parties further stipulated that the computers were expected to have a useful life of at least 3 years beyond the expiration of the lease terms and that a residual value of at least 14 percent was reasonably expected; such amount would have enabled the partnership to recoup its original cash investment and to break even. We found, moreover, that the record supported a reasonable potential for residual values of as much as 30 percent. We determined that because the partnership retained a significant benefit and burden with respect to the computer equipment—that its residual value would generate either a profit or a loss—the leases were genuine and the partnership was the owner of the equipment for purposes of Federal tax law. 84 T.C. at 433-435.

Whereas *Estate of Thomas* involved a genuine three-party transaction, the present case involves only two parties, EMI and Hart. In *Estate of Thomas*, the seller, IBM, possessed no rights in the property following the sale to the partnership, and the lessees' rights did not rise to the level of ownership, despite the use of net leases, because such rights would terminate prior to the expiration of the equipment's useful life. Here, the seller, EMI, retained all substantial rights to the motion picture and its proceeds in perpetuity. Hart did not acquire the benefits and burdens associated with ownership of the movie. Furthermore, unlike *Estate of Thomas*, the seller and buyer here did not negotiate the purchase price at arm's length. EMI was unconcerned about the total price because the bulk of it was payable only out of funds supplied by EMI itself. In *Estate of Thomas*, the partnership secured nonrecourse financing from independent banks and a finance company. Repayment of such loans

with the lease payments yielded the partnership an equity in the equipment (barring the unforeseen drop in the equipment's value), which the partnership could not prudently abandon. 84 T.C. at 439. In contrast, the Hart note and the level II payments with which it was retired were wholly lacking in economic substance. For these reasons, the present case is not governed by *Estate of Thomas.* The petitioner's reliance on *Commissioner v. Brown*, 380 U.S. 563 (1965), is misplaced for similar reasons.

Having concluded that EMI, and not Hart, was the actual owner of the motion picture, it follows that Hart was not entitled to claim deductions for depreciation of the motion picture. The next issue for decision is therefore whether Hart acquired any interest of a character subject to an allowance for depreciation, and if so, the amount of its depreciable basis and the allowable method of depreciating such basis.[19] The Commissioner contends that Hart made a mere "wager" that Universal's accountable gross would reach levels sufficient to require EMI to make payments. He maintains that a wager is not depreciable, that Hart may recover its cost basis in such wager from the initial receipts under level I, and that amounts received in excess of basis constitute taxable income. In the alternative, the Commissioner now concedes, for purposes of this case only, that if we find that Hart purchased an income interest akin to a participation, Hart is entitled to depreciate its basis in such interest under the straight line method in 1978 and 1979.

The Commissioner has cited no legal authority in support of his position that the interest acquired by Hart amounted to no more than a wager. In a sense, most business ventures have a wagering aspect, particularly when a profit depends on the success of a highly speculative property, such as a motion picture, book, or record. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 550-553 (1984), on appeal (2d Cir., March 26, 1985). Here, we have concluded that Hart did not invest *in* a motion picture but that Hart purchased an income interest *dependent on* the success of a motion picture. Such income interest was subject to exhaustion over time in the same way that an investment in the motion picture itself would have declined in value as the

---

[19]The property's salvage value (or lack thereof) and economic useful life are not at issue.

income-producing potential of the motion picture waned over time. See *Twentieth Century-Fox Film Corp. v. Commissioner*, 45 T.C. 137 (1965), affd. 372 F.2d 281 (2d Cir. 1967) (a motion picture, once placed in service, is depreciable even though it is not currently producing income). We therefore conclude that Hart is entitled to an allowance for depreciation. Cf. *Barnes v. Commissioner*, 8 B.T.A. 360 (1927) (a contractual right, acquired by purchase, to receive royalties from the exploitation of a patent is depreciable).

On its returns, Hart depreciated its claimed investment in the motion picture under the declining balance method in 1978 and the straight line method in 1979. The declining balance method may not be used to depreciate intangible property. Sec. 167(c). Since a contract right is an intangible asset (B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 23.2.6, at. 23-2 (1981)), Hart was not entitled to use the declining balance method in 1978. In his notices of deficiency, the Commissioner determined that Hart must depreciate its claimed investment in the motion picture under the income forecast method. The petitioner contends that use of the income forecast method is optional, and he also maintains that the issue of whether Hart was entitled to use the declining balance method is not properly before the Court. As the Commissioner has conceded on brief that, for purposes of this case, Hart may depreciate its income interest under the straight line method in 1978 as well as in 1979, we need not decide whether Hart was required to use the income forecast method.[20] With respect to the petitioner's second contention, we think that the notices of deficiency did raise such issue because a determination that the partnership must use the income forecast method necessarily encompassed a determination that the method used, declining balance, was unacceptable. We therefore conclude

---

[20]Neither party has cited sec. 280, which requires individuals to capitalize the production costs of motion pictures and certain other properties produced after 1975 and to amortize such costs under an income forecast method. Enacted as part of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, sec. 280 was aimed at the so-called production company shelter: a partnership which was formed to produce (but not own) a motion picture and which used the cash method of accounting and expensed the costs of production as they were paid; typically, the partnership was heavily leveraged and significant costs were paid with borrowed funds. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 109-117; see, e.g., *Estate of Helliwell v. Commissioner*, 77 T.C. 964 (1981). Without deciding the issue, we observe that sec. 280, on its face, does not appear to apply to an income interest like the one purchased by the partnership here.

that Hart may depreciate its income interest under the straight line method in 1978 and 1979.

Section 167(g) provides that the basis of depreciable property is the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. Section 1011 provides that the basis of such property is generally its cost (as prescribed by section 1012) adjusted as provided in section 1016. Under section 1016, the cost basis of property is adjusted for, among other things, "expenditures, receipts, losses, or other items, properly chargeable to capital account." The phrase "chargeable to capital account" is given the same meaning that it normally carries for accountants, i.e., an addition to the cost of an asset. *Purvis v. Commissioner*, 65 T.C. 1165, 1168 (1976). Thus, the capitalized items "must bear some reasonable relationship to the asset sold and they must be made *with respect to such property*" in order to be included in the depreciable basis of such property. 3A J. Mertens, Law of Federal Income Taxation, sec. 21.22 (1977) (emphasis in original).

Hart claimed a depreciable basis of $8,384,562 on its 1978 return, which basis was comprised essentially of the following:

| | |
|---|---:|
| Cash paid to EMI, excluding $300,000 deducted as prepaid interest | $925,000 |
| Cash paid to Lionel | 10,000 |
| Promissory note | 7,175,000 |
| "Acquisition fee" due TBC Films less sales commissions paid in connection with sale of partnership interests | 274,562 |
| | 8,384,562 |

In 1979, such basis was reduced to $8,345,600 to account for the payment of an additional $38,962 of sales commissions because such commissions reduced the size of the "acquisition fee" due TBC Films. Hart claimed no deduction, either as an expense or as amortization, with respect to such sales commissions or with respect to the $20,000 "syndication fee" paid to TBC Films.

In his notices of deficiency, the Commissioner did not contest the basis claimed by Hart. However, by amendment of his answers, the Commissioner asserted that Hart's basis did not exceed $1,225,000 (i.e., the total amount of cash paid to EMI, including the $300,000 characterized as "pre-

paid interest" and deducted on Hart's 1978 and 1979 returns). He now contends that Hart's basis was limited to $490,000, which he computes by subtracting $735,000 from the cash payments of $1,225,000.

The Commissioner asserts that $735,000 of the cash paid to EMI actually constituted a loan to EMI. Under the British Lion distribution agreement, if Hart did not receive $735,000 of level I payments within 36 months of the motion picture's release, Hart was entitled to receive an amount equal to the lesser of 100 percent of Universal's accountable gross or the difference between the level I payments already received by Hart and $735,000. The Commissioner contends that such provision guaranteed Hart a return of at least $735,000 because it was "virtually impossible" that Universal's accountable gross would be less than $735,000. He also relies on an unsigned letter agreement between EMI and Great Lakes, dated June 27, 1978, wherein it is stated that:

8. If after 36 months following the release in the United States of the Picture we or our designee or assigns have not recouped the sum of $735,000, * * * then we shall receive, and you agree to pay or cause to be paid such sums as are necessary to supplement amounts which have already been paid to us * * * in order that our total recoupment from the domestic receipts of the Picture will equal $735,000.

The petitioner contends that the Commissioner's "loan" argument is a new matter not properly before the Court. We agree with the petitioner. These dockets are a "test case" selected by counsel for both parties as representative of the facts involved in a large number of other cases. After hearing reports of counsel, we issued an order setting this case for trial, specifying dates by which discovery was to be completed, and expressly stating that "Any amendments to the pleadings in these cases shall be filed on or before February 15, 1984, and no further amendments of such pleadings will be permitted." On February 17, 1984, the Commissioner filed amendments to the answers, which asserted that Hart's basis was limited to the $1,225,000 cash paid EMI. We allowed such amendments over the petitioner's objection. The Commissioner raised his "loan" argument for the first time in his pre-trial brief, filed with the Court only 5 days before trial. In light of our prior

order limiting further amendments in hopes of framing the issues well in advance of the trial, and considering the numerous and complex issues that we subsequently allowed the Commissioner to raise by amendment, we think that consideration of the Commissioner's "loan" argument at this time would unfairly prejudice the petitioner, particularly as the petitioner had little time to develop evidence to rebut the Commissioner's argument. See *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555-557 (1973), and the cases cited therein. Accordingly, we decline to consider such argument.

The Commissioner bears the burden of proving that Hart's basis was limited to $1,225,000, the total cash paid to EMI. We have already concluded that Lionel served no business purpose in the transaction between EMI and Hart. The $10,000 that Lionel received from Hart was obviously only a fee paid to Mr. Takiff for allowing his company to be used to create the appearance of "risk" to Hart's partners, so that they could deduct the full amount of Hart's purported losses. Because such fee was unrelated to the acquisition of Hart's income interest, it was not properly chargeable to the basis of such interest.

We have also concluded that the $7,175,000 note was not a bona fide indebtedness. A bogus debt does not reflect an investment in the property acquired, and consequently, it cannot be included in Hart's depreciable basis. *Estate of Franklin v. Commissioner, supra*; *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659 (1982).

Hart's claimed basis included a $274,562 "acquisition fee" (reduced to $235,600 in 1979) due TBC Films. According to the informational memorandum provided to Hart investors, the payment was for TBC Films' services in finding the motion picture and negotiating its purchase. The Commissioner contends that such fee was actually a payment for TBC Films' assistance in selling partnership interests. Syndication fees are not deductible, either as expenses or through amortization. Sec. 709(a); *Estate of Thomas v. Commissioner, supra*. The Commissioner argues that TBC Films' assistance in finding the picture was limited to Mr. Pearl's receipt of a telephone call from Mr. Strauss and that Mr.

Pearl's negotiations for the purchase were not extensive. He points out that Mr. Pearl's law firm, Katten, Muchin, billed TBC Films $9,806 for the law firm's services in connection with the transaction. He concludes that "There simply is no reason to believe that the reported fee compensated TBC Films for 'finding' and 'negotiating' the deal, except for $9,806, the amount billed TBC Films" by Katten, Muchin, and that the remainder "in all likelihood" was for TBC Films' assistance in locating investors. We cannot conclude on such meager evidence that the acquisition fee was, in fact, a syndication expense. Although the acquisition fee may have been generous, there is no evidence that the payment of a finder's fee, or commission, is not ordinary or necessary in this type of transaction. Moreover, we also observe that Hart separately paid $20,000 to TBC Films as a syndication fee and $64,400 of commissions for the sale of partnership interests. Since Balcor, an affiliate of TBC Films, syndicated the partnership interests, it is very likely, although the record does not conclusively establish, that all or a portion of such sales commissions were paid to Balcor. There is no evidence that such payments did not sufficiently compensate TBC Films for its services relating to the syndication of the partnership. For these reasons, we conclude that the Commissioner has failed to prove that the acquisition fee was not properly chargeable to Hart's basis.

In summary, we conclude that Hart's basis for depreciation was limited to the $1,225,000 cash paid to EMI plus the $235,600 acquisition fee paid to TBC Films. Such basis includes the $300,000 paid to EMI and mischaracterized and deducted as prepaid interest on Hart's 1978 and 1979 returns. See *Siegel v. Commissioner*, 78 T.C. at 686-687 & n. 5. Because the Hart note and the level II payments with which it was payable were a sham, no interest deductions are allowable with respect to the note. *Knetsch v. United States, supra; Golsen v. Commissioner, supra; Karme v. Commissioner*, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).

On its 1978 Federal partnership return, Hart deducted $20,000 for a guaranteed payment to its general partner, TBC Films, $1,000 for amortization of a $15,000 "organization fee" paid to TBC Films, and $6 for unspecified

"Miscellaneous" expenses. On its 1979 return, Hart deducted $20,000 for a guaranteed payment to TBC Films, $3,000 for amortization of the organization fee, and $82 for unspecified miscellaneous expenses. In his notices of deficiency, the Commissioner disallowed such deductions in their entirety. The petitioner bears the burden of proving that the Commissioner's determination was in error. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). We shall consider each claimed deduction separately.

The Commissioner contends that no deduction is allowable with respect to the $20,000 guaranteed payments to TBC Films because the payments represent capital expenditures that are nonamortizable, nondepreciable, and nondeductible. The petitioner contends that such payments were a fee for management services provided by TBC Films to Hart.

According to Hart's partnership agreement, the $20,000 management fees were guaranteed payments under section 707(c). To be deductible by a partnership, a guaranteed payment must satisfy the requirements of section 162, and the rules of section 263 must be taken into account. Sec. 707(c); sec. 1.707-1(c), Income Tax Regs.; *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."[21] In determining whether the management fees in the present case are deductible under section 162(a), we look to the nature of the services performed by TBC Films rather than to their designation or treatment by the partnership. *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179, 187 (1918); *Cagle v. Commissioner*, 63 T.C. at 96. Payments allocable to organizational costs and syndication expenses must be capitalized. Organizational costs are amortizable over a 60-month period, but syndication costs are not amortizable. Secs. 263,

---

[21]Neither party has addressed the possibility that Hart may not have been carrying on a trade or business if, as we have determined, it did not acquire and distribute the motion picture. However, the resolution of such issue is not crucial to the outcome of this case. Although a partnership is not allowed the nonbusiness expense deduction under sec. 212 in computing its taxable income (sec. 703(a)(2)(E)), a partnership can incur expenses that the partners may deduct under sec. 212. See sec. 1.702-1(a)(8)(i), Income Tax Regs.

709; *Estate of Boyd v. Commissioner*, 76 T.C. 646, 658 (1981); *Estate of Thomas v. Commissioner*, 84 T.C. at 441, and the cases cited therein. The petitioner "bears the burden of proving what portion of the fee is allocable to nondeductible capital portions and to deductible expense portions (*Estate of Boyd v. Commissioner, supra*), and such allocation must reasonably comport with the value of the services performed." *Wildman v. Commissioner*, 78 T.C. 943, 958 (1982); see also *Merians v. Commissioner*, 60 T.C. 187 (1973).

The only evidence offered by the petitioner in support of the management fee was the testimony of Joseph Kruszynski, a partner in RGF and the chief financial officer of TBC Films and Balcor. Mr. Kruszynski testified that TBC Films, using employees of Balcor since TBC Films had no employees, provided the following services to Hart: kept Hart's books and records, paid bills, handled correspondence from the limited partners, received capital contributions of the limited partners, opened a partnership bank account, reconciled the bank account, invested partnership funds in the bank account, prepared the partnership tax returns, and prepared forms K-1 and advised the limited partners of their filing requirements. Mr. Kruszynski presented no bills or records itemizing such services, the time spent on each, or their value.

An examination of the circumstances in which TBC Films provided services to the partnership fails to convince us that the management fee was a deductible expense. It is revealing that the fee was paid only in 1978 and 1979, the years in which the motion picture transactions were negotiated and concluded, investors were solicited, the partnership was organized, and capital contributions were received. Nearly all of the services referred to by the petitioner pertained to the organization and syndication of the partnership and the purported acquisition of the motion picture. Once TBC Films completed such formative tasks, there were very few "management services" that it could provide to Hart because Hart was a purely passive investment vehicle. Cf. *Keller v. Commissioner*, 79 T.C. 7, 49-50 (1982), affd. 725 F.2d 1173 (8th Cir. 1984). TBC Films' services were limited to receiving distribution reports and the level I payments

from British Lion (EMI), making distributions to the partners, keeping the books, and preparing tax returns. Because the petitioner has given us no basis for valuing such services, we are in no position to allocate a portion of the management fee to them. Sec. 162; *Wildman v. Commissioner, supra.* Thus, the entire $40,000 must be capitalized. Moreover, since the petitioner has neither asserted a claim nor suggested a method of calculating what portion of the fees, if any, are allocable to organization costs amortizable under section 709(b), we allow no deduction in 1978 and 1979 attributable to the fees. Rule 142(a).

Hart capitalized and elected, under section 709(b), to amortize as an organization expense over a period of 60 months the $15,000 "organization fee" paid to TBC Films. The Commissioner contends that the petitioner has failed to substantiate the organizational services, if any, performed in return for the organization fee.

Section 709(b)(2) defines organization expenses as expenditures which are incident to the creation of the partnership, chargeable to capital account, and of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Examples of organization expenses include legal fees incident to the organization of the partnership, such as negotiation and preparation of a partnership agreement, accounting fees for services incident to the organization of the partnership, and filing fees. Sec. 1.709-2(a), Income Tax Regs.

The petitioner relies again upon the testimony of Mr. Kruszynski to substantiate the organizational services provided by TBC Films. His testimony was extremely vague. He stated that the $15,000 fee was calculated "Basically through determining the cost of organizing the limited partnership, from past experience, et cetera." He stated that a "good portion" of the organizational fee was attributable to legal fees paid to Katten, Muchin. TBC Films paid Katten, Muchin a total of $9,806 for legal services rendered in connection with Hart. However, Katten, Muchin's itemized bill reveals that most of such services did not relate to the organization of the partnership. Moreover, most of the documents prepared by Katten,

Muchin related to either the purported acquisition of the motion picture or the syndication of the partnership. Using our best judgment, we find that only $4,000 of the legal expenses were attributable to Hart's organization. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). Because no evidence substantiates the extent or value of any other organizational services that may have been provided through TBC Films, we conclude that Hart's amortizable organization expenses are limited to $4,000.

There is no evidence of record substantiating Hart's claimed miscellaneous deductions of $6 in 1978 and $82 in 1979, and the petitioner has declined to address such issue. We therefore hold that Hart is not entitled to such deductions.

The next issue for decision is whether the petitioner's share of Hart's expenses must be limited to the amount allowed under section 183.[22] The Commissioner bears the burden of proving that the partnership was an activity "not engaged in for profit" within the meaning of section 183, having raised such issue for the first time by amendment of his answers. Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976). In determining whether the partnership engaged in the activity for a profit, "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.; *Jasionowski v. Commissioner, supra*; *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

The relevant facts present a very close case: on the one hand, the presence of numerous, artificial stratagems and players (for example, the bogus level II payments, note, and

---

[22]Sec. 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(b)(1) allows those deductions which would be available without regard to whether or not such activity is engaged in for profit. Sec. 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deduction allowable by reason of paragraph (1)." Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under sec. 162 or under paragraph (1)or (2) of section 212."

assumption agreements, and the unnecessary inclusion of Great Lakes and Lionel) evidence a strong intention to generate substantial tax losses, usable to offset the limited partners' outside income; but, on the other hand, other facts reveal that the partnership had at least a reasonable prospect of making an economic profit, and a not insignificant profit did, in fact, materialize. Moreover, once stripped of its tax-motivated accoutrements and undeserved deductions, the partnership's investment actually generated substantial taxable income in 1979.[23] Of course, the occurrence of incidental economic profits or taxable income is not conclusive of whether an activity is engaged in for profit (sec. 1.183-2(b), Income Tax Regs.; B. Bittker, *supra*, par. 20.1.2, at 20-8), but such factors do weigh strongly in the partnership's favor, particularly as its investment involves no personal or recreational elements. Weighing all the relevant facts of record, we conclude that the Commissioner has not carried his burden of proving that Hart's motion picture-related investment was not engaged in for a profit.

The present case is distinguishable from the recent cases of *Beck v. Commissioner*, 85 T.C. 557 (1985), and *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984). In those cases, we determined that the taxpayers' activities were not engaged in for profit because the evidence of record revealed that the taxpayers were completely indifferent to whether or not they made an economic profit. *Beck v. Commissioner, supra* at 574-576; *Estate of Baron v. Commissioner, supra* at 560. Here, Mr. Pearl and his partner in

---

[23] By our own reckoning, Hart had the following income, deductions, profits, and losses in 1978 and 1979, the years in issue:

|  | 1978 | 1979 |
|---|---|---|
| Gross receipts | - - - | $1,549,078 |
| Interest income | - - - | 9,317 |
| Total income | - - - | 1,558,395 |
| Expenses |  |  |
| Depreciation (straight line, based on 3-year useful life, no salvage value, property acquired 9/27/78) | $128,053 | 487,867 |
| Amortization of organizaton cost (organized 9/1/78) | 267 | 800 |
| Total expenses | 128,320 | 487,667 |
| Ordinary income (loss) | (128,320) | 1,070,728 |

Although subsequent years are not before us, we estimate that Hart had net losses in 1980 and 1981, and net profits in 1982 and thereafter. The occurrence of such losses is attributable solely to the application of the straight line method of depreciation.

TBC Films, RGF, took particular care to select investments based on the success of motion pictures by respected production companies where adequate distribution by prominent distributors was assured. Several of the motion picture partnerships promoted by Mr. Pearl and RGF prior to the creation of Hart had returned a profit to their investors. Mr. Pearl used the same approach in selecting an investment for Hart. The partnership's income interest was based on the success of "The Deer Hunter." The picture was directed and co-written by the well-regarded Michael Cimino; it had a well known cast, including a prominent male lead, Robert DeNiro; its production costs approached $12 million; and Universal planned a well-financed distribution effort. The cash price that Hart paid for its income interest was negotiated at arm's length with EMI after EMI had already rejected offers from several other partnership promoters as too low. Such factors reveal a genuine concern for the ultimate profitability of the investment.

The final issue for decision is whether the petitioner is entitled to an investment tax credit with respect to "The Deer Hunter" in 1978. Hart claimed a qualified investment of $1,209,532 with respect to a motion picture having a useful life of at least 5 but less than 7 years.[24] The Commissioner disallowed such credit in his notice of deficiency on the ground that the petitioner had not established the extent of Hart's ownership interest, if any, in property qualified for the credit.

In order to claim an investment tax credit with respect to a motion picture film, the taxpayer must have an "ownership interest" in the film and the film must be "new section 38 property" (determined without regard to useful life) which is a "qualified film." Sec. 48(k)(1)(A). For purposes of subsection (k) of section 48, a taxpayer's "ownership interest" in a qualified film is determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film. Sec. 48(k)(1)(C). "Qualified United States production costs" is used in lieu of basis in the property in determining the amount of the

---

[24]Hart's reported qualified investment of $1,209,532 apparently was composed of the cash downpayments to EMI ($250,000 in Sept. 1978 and $675,000 in March 1979) and the $274,562 "acquisition fee" due TBC Films. The petitioner has conceded on brief that Hart's qualified investment did not exceed $925,000.

taxpayer's "qualified investment" available for the credit. Sec. 48(k)(4)(B).

In enacting subsection (k) of section 48, Congress recognized that more than one taxpayer may be entitled to a share of the credit for the same film. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. The Secretary of the Treasury was authorized to establish procedures for determining who is entitled to the credit or to a partial credit in cases where more than one taxpayer bears the risk of loss with respect to a particular film. S. Rept. 94-938, *supra.*

Section 1.48-8(a)(4) of the regulations defines the "ownership interest" required to claim the entire or partial credit with respect to a qualified motion picture:

(4) *Ownership interest*—(i) *In general.* To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to the production costs by a taxpayer is the amount that the taxpayer's capital is at risk. * * *

\*      \*      \*      \*      \*      \*      \*

(iii) *Certain lenders and guarantors considered to have an ownership interest.* To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film. * * *

For purposes of section 1.48-8, "a part" of a film "means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in the medium(s) in the geographical area(s)." Sec. 1.48-8(a)(2), Income Tax Regs.[25]

---

[25]The petitioner argues that the definition of "a part" of a film, contained in subparagraph (2) of sec. 1.48-8(a), does not apply to the use of the phrase "a part of the film" under subparagraph (4) of sec. 1-48-8(a). Such argument is wholly without merit. The definition

Although Hart was at risk with respect to the cash paid to EMI, it did not possess an ownership interest in any part of "The Deer Hunter" for purposes of the investment credit. We have determined that the partnership acquired no depreciable interest in the film because, between them, Universal and EMI possessed the exclusive and perpetual right to exploit the motion picture in the United States and Canada. The petitioner expressly denies that Hart possessed an ownership interest by virtue of being a lender or guarantor pursuant to section 1.48-8(a)(4)(iii), Income Tax Regs. We therefore conclude that the petitioner is not entitled to an investment tax credit with respect to "The Deer Hunter."

Because of our resolution of the above issues, we find it unnecessary to consider alternative contentions raised by the Commissioner in his notices of deficiency and amended answers.

*Decisions will be entered under Rule 155.*

states: "For purposes of *this section*, 'a part' of a film means * * * ." Sec. 1.48-8(a)(2) (emphasis added). A reference within a subparagraph of a section of the regulations to "this section" refers to the section within which the subparagraph is contained, sec. 1.48-8 in the present case. Moreover, the phrase "a part of the film" is not separately defined under subparagraph (4) of sec. 1.48-8(a), further indicating that the definition of such phrase in subparagraph (2) is applicable to the entire section.